PERRY COMPTON v. LOUIS RICH CONSTRUCTION COMPANY, Appellant.

Division One, October 11, 1926.

1. **MASTER AND SERVANT: Tools: Continuing Duty.** It is the duty of the master to furnish his servant with reasonably safe appliances with which to do the work assigned to him by the master, and the duty is a continuing one, and the servant may assume that the master has performed such duty; but regard must be had not only to the character of the work to be performed, but also to the ordinary hazards of the employment.

2. ————: **Insurer: Reasonable Safety: Customary Use.** The legal test of reasonable safety in machinery or methods is customary use by those engaged in like employment and work. The master is not an insurer of the safety of the appliance or of the safety of the servant in using the appliance. Nor does the mere fact of an accident and consequent injury to the servant, as a general rule, make out a prima-facie case of the master's negligence.

3. ————: **Specific Negligence: Res Ipsa Loquitur.** If the petition charges a specific act of negligence the doctrine of **res ipsa loquitur** does not apply, but the burden is upon plaintiff to make out a prima-facie case upon the specific negligence charged.

4. **NEGLIGENCE: Inference.** Negligence is an inference from facts put in evidence; it is established by reasonable inferences from other facts, as well as by more direct proof.

5. ————: **Question for Jury.** To establish negligence on the part of the master the evidence must preponderate in favor of the servant, but this may arise either circumstantially or directly, and in any event the question should be submitted to the jury where there is any substantial evidence whatever tending to establish the negligence alleged.

6. **MASTER AND SERVANT. Volunteer.** Where plaintiff testified he was ordered by an officer of defendant to take the tractor and haul in the water-tank wagon, and defendant's foreman testified he saw plaintiff driving the tractor, knew that he was going to get the water tank and acquiesced therein, the question whether defendant furnished plaintiff with the tractor and ordered him to use it in hauling the water tank was one for the jury.

7. ————: **Machinery: New Functions: Knowledge.** If the tractor had never been used in hauling a water-tank wagon by the master or his representative, prior to the time the servant hitched the tractor to the wagon and the tractor turned over and injured him, and the servant was thereby exposed to undue risks, the master must responde in damages for the injury resulting from the new risks, and cannot excuse himself by showing that the tractor was a suitable instrumentality for hauling the wagon; and substantial and positive testimony to the effect that the tractor had never been previously used in hauling the wagon must be accepted as true in considering the master's demurrer to the servant's evidence.

8. ———: **Dangerous Machinery: Obvious Defects: Risk: Contributory Negligence: Tractor.**   The servant does not assume a risk which is the outgrowth of the master's negligence in furnishing him dangerous machinery with which to work; he only assumes the usual and ordinary risks incident to his employment.   Nor can the servant be held guilty of contributory negligence, as a matter of law, unless the danger occasioned by the master's negligence is so glaring and obvious to the servant as to threaten immediate and almost certain injury.   Where the servant was ordered by an officer of the construction company to use a tractor for hauling a water-tank wagon, the evidence is substantial that the tractor had never before been used for that purpose, and that such a tractor, when subjected to such a heavy load, will suddenly rear up upon its hind wheels and turn over; the tractor was a complex machine, and it could not be easily and readily determined whether it was defective or unsuitable for the purpose of hauling the wagon; the testimony is positive that the servant had never used it or seen it used for that purpose; and that after he had hitched the tractor to the wagon and begun to move it, the tractor turned over and injured him, he cannot, in his suit to recover for the injuries received, be held, as a matter of law, to have assumed the risk, or to have been guilty of contributory negligence in using a tractor so glaringly and dangerously defective that a person of ordinary prudence would have refused to use it.

9. **CONTRIBUTORY NEGLIGENCE: When Question for Jury.**   Where reasonable minds may differ as to the inferences to be drawn from facts and circumstances tending to prove contributory negligence, the question is one for the jury.

10. **EVIDENCE: Belated Objection: Broader than Pleading.**   A contention that certain testimony admitted in evidence was broader than the scope of the allegations will not be considered in the appellate court if no such objection was presented or urged in the trial court.

11. **ASSIGNMENT: Entitled to Review.**   An assignment in the brief that testimony set out on certain pages of the printed record was erroneously admitted is not entitled to consideration, where the assignment is not briefed, no authority is cited in support of it, and it is not argued or referred to in argument, but will be treated as abandoned.

12. **INSTRUCTION: Broader than Petition: Unsuitable Machine.**   The instruction set out in full did not authorize the jury to return a verdict for plaintiff if they found the tractor was unsuitable for the purpose for which it was furnished, without requiring them to find it was unsuitable because too light for such purpose, and was not broader in its scope than either the petition or evidence.

---

Corpus Juris-Cyc. References: **Appeal and Error,** 3 C. J., Section 733, p. 819, n. 26; 4 C. J., Section 3057, p. 1068, n. 22, 23.   **Master and Servant,** 39 C. J., Section 441, p. 308, n. 13; p. 312, n. 14, 15, 16; Section 442, p. 313, n. 21; p. 314, n. 22; Section 558, p. 442, n. 30; Section 896, p. 692, n. 6; p. 695, n. 19; Section 898, p. 697, n. 41; Section 908, p. 705, n. 21; Section 1071, p. 855, n. 40 New; Section 1200, p. 972, n. 88; Section 1201, p. 980, n. 17; Section 1207, p. 987, n. 2; Section 1268, p. 1054, n. 25, 26; p. 1055, n. 27; p. 1056, n. 28; Section 1269, p. 1056, n. 32; Section 1319, p. 1124, n. 99; Section 1329, p. 1138, n. 74; Section 1351, p. 1167, n. 71; Section 1384, p. 1203, n. 69; Section 1400, p. 1219, n. 55; Section 1414, p. 1236, n. 89. **Negligence,** 29 Cyc., p. 622, n. 96; p. 631, n. 53.   **Trial,** 38 Cyc., p. 1543, n. 68, 69.

Appeal from St. Louis County Circuit Court.—*Hon. G. A. Wurdeman,* Judge.

AFFIRMED.

*Ralph & Baxter* for appellant.

(1) Respondent's evidence failed to make a prima-facie case and a demurrer to the evidence should have been sustained. (a) Negligence on the part of the defendant cannot be presumed and the court has no right to presume it. If the respondent by his evidence has not shown that appellant was negligent in allowing respondent to use this tractor or in ordering him to use it, as the case may be, then it is the duty of the court to sustain a demurrer to plaintiff's evidence. Roberts v. Tel. Co., 166 Mo. 370. (b) The plaintiff in a personal injury suit, in order to recover, must establish a prima-facie case upon the specific negligence charged in his petition, and the master is not an insurer of the safety of the place where the servant is put to work. It is only incumbent upon him to exercise ordinary care for the safety of a servant, and in order for the servant to recover he must offer proof of the negligence of the master and connect the same with the injury as its cause. Pippin v. Construction Co., 187 Mo. App. 361; McGahan v. Transit Co., 201 Mo. 500. (c) Unless the foreman's order to respondent to take the tractor and bring in the water tank included an order to handle said tractor in a particular manner the master is not liable for the giving of such an order. McCollin v. Masonry & Const. Co., 247 Mo. 174. (2) Respondent's own testimony clearly makes out a case of assumption of risk on his part, coupled with his own negligence, and he cannot recover. Roberts v. Tel. Co., 166 Mo. 378; Thomas v. Railroad, 109 Mo. 199; Steinhauser v. Spraul, 127 Mo. 562; Mathis v. Stockyards Co., 185 Mo. 444; Powers v. Loose-Wiles Co., 195 Mo. App. 433; Nugent v. Milling Co., 131 Mo. 245; Flack v. Railway Co., 285 Mo. 28. If the Fordson tractor was too light for the purpose of hauling in the water tank, such defect was a patent one, open as much to the observation of respondent, a mechanic, as it was to appellant, his employer, and this being the case he is held to a knowledge of such defect whether he actually knew of same or not, and he cannot recover. Mathis v. Stockyards Co., 185 Mo. 446; McGinnis v. Press Brick Co., 261 Mo. 298; Powers v. Loose-Wiles Co., 195 Mo. App. 431. (3) Respondent charges two specific acts of negligence on the part of the appellant, viz: first, that the tractor was too light, and, second, that it was not suitably equipped with connections, and he must show that the negligence of the appellant in the particulars complained of were the proximate cause of his injury or he cannot recover. The question of the suitability of connections was abandoned by respondent at the trial, and that issue was not submitted to the jury. There was no evidence adduced that the tractor was too light or did not have proper connections. Van Bibber v. Swift & Co., 286 Mo. 317; Pippin v. Const. Co., 187 Mo. App. 361. "Where a specific act of negligence is charged the *res ipsa loquitur* doctrine is not applicable." Rich v. White, 239 S. W. 141. (4) The

testimony of respondent clearly shows that he placed a severer strain on said tractor than was contemplated by his master, by his failure to remove the earth packed around the wheels of the water tank when he knew the wheels thereof were imbedded in the earth, and he cannot recover. Powell v. Electrical Co., 195 Mo. App. 150. (5)  Instruction 1 offered is bad, as it is broader than the petition or evidence, in that in several parts of said instruction it allowed the jury to find for the plaintiff if the tractor was "unsuitable for said purpose," without requiring them to find that it was "unsuitable for said purpose" because it was too light, and it gave the jury a roving commission to find for plaintiff upon any one of various reasons they might have for believing the tractor was "unsuitable for said purpose," or was "dangerous." The jury might have found that the tractor turned over because the "gearing was defective for the reason that where it should be on top it is on the bottom," or because "the pinion will climb the ring gear," as testified to by witness Koch.

*Taylor, Mayer & Shifrin* for respondent.

(1)  In considering a demurrer to the evidence, the jury being the arbiters of the facts, the court must accept plaintiff's "evidence as true, whether contradicted or not by defendant's proof, so long as it is not impossible as opposed to the physics of the case or entirely beyond reason. It takes defendant's testimony as untrue where contradicted by plaintiff's proof. It leaves to the jury to settle the weight due the testimony, the credit due the witnesses and to reconcile contradictions, if any, in proof. So, it allows to plaintiff's case, the benefit of every reasonable inference of fact arising on all the proof." Stauffer v. Street Ry. Co., 243 Mo. 316. On this basis, the plaintiff made a case for the jury. (a)  Having all this evidence before it, the jury had the right to deduce therefrom the fact that the Fordson tractor was too light to pull the water tank, and that when an attempt would be made to pull it with the Fordson the latter was liable to rear up and fall over on and crush the driver. The verdict shows that they did make that deduction. (b)  It is the duty of a master to exercise ordinary care to see that his servant is furnished with reasonably safe instrumentalities with which to do his work. If he fails in that duty and his servant is thereby injured the master is liable. Minnier v. Railway Co., 167 Mo. 99; Bradley v. Coal Co., 167 Mo. App. 177. Before furnishing the servant with an instrumentality with which to do a piece of work for the master, it is that master's duty to exercise reasonable care to ascertain whether or not that instrumentality is reasonably fit for that purpose. If he fails to perform that duty and, because of such failure, the servant is injured,

the master is liable. The fact that the master is ignorant does not exculpate him if, upon proper inquiry, he could have learned that the Fordson was too light to pull that water tank. 3 La Batt on Master & Servant, secs. 1024, 1023, pp. 2713, 2712. (c) Defendant's claim is that unless the foreman's order included an order to handle the tractor in a particular manner the master is not liable for the giving of such an order. The evidence shows that the order was to bring in the water-tank wagon with the Fordson tractor and that is exactly what Compton attempted to do. (2) The defense of assumption of risk has no place in the case at bar. The foundation of the case for plaintiff is that the master was negligent in furnishing him with an unsuitable and unfit instrumentality with which to perform a certain task and also negligent in ordering him to perform that task by using that instrumentality. To this there can be but two defenses, (a) there was no such negligence, and (b) although the master may have been thus negligent yet the servant cannot recover because of his own negligence which directly contributed to cause his injury. Fish v. Railroad, 263 Mo. 124; Williams v. Pryor, 272 Mo. 623; Littig v. Urbauer-Atwood, 292 Mo. 241; Doody v. California W. M. Co., 216 S. W. 534; Soltesz v. Provision Co., 260 S. W. 992. (3) Defendant's next point is that if the Fordson was too light for the purpose of hauling the water tank then that defect was patent and as much open to the observation of the servant as of the master, and if, by its use, the servant was injured because of such defect he cannot recover. If this defect was patent, then there is something wrong with the evidence offered by defendant, who sought to show that the Fordson was well fitted for the task to which the master had assigned it. Whether or not it was so defective was a bitterly contested issue, which, so far as this case is concerned, was finally solved by the verdict of the jury. Holmes v. Brandenburg, 172 Mo. 65.

SEDDON, C.—Plaintiff seeks to recover damages for personal injuries alleged to have been occasioned by defendant's negligence. Defendant is a corporation which was engaged in the construction of a concrete roadway or pavement on Manchester Road in St. Louis County. Plaintiff was injured on May 15, 1922, at or about noon of that day. Plaintiff alleges in his petition that, on said date and while in the employ of defendant, he was ordered and instructed by a superintendent or foreman of defendant, in charge of and directing plaintiff, to drive a Fordson tractor from defendant's construction camp to a point on said Manchester Road and, with said tractor, to bring back to the construction camp a certain water-tank wagon, which had been left standing on Manchester Road some distance from the construction camp; that said water-tank wagon was

large and heavy and was facing westwardly on said road and was partially mired, and, in order to bring back said tank wagon as ordered, it was necessary to connect the tractor with said tank wagon and turn the tank wagon around so as to face eastwardly; that, while endeavoring so to turn said tank wagon around with the Fordson tractor, the tractor was caused to turn over and fall upon plaintiff, because of the negligence and carelessness of defendant and its agents, charged, in the language of the petition, to be as follows:

"1st.   That defendant's said superintendent or foreman negligently and carelessly ordered and required plaintiff to use a Fordson tractor for the purpose of turning around and bringing in said water-tank wagon, when the said foreman or superintendent knew, or by the exercise of ordinary care on his part should have known, that said Fordson tractor was unsuitable for such purpose and was dangerous and was liable when being used for said purpose, to turn over and injure him, for that it, the said tractor, was too small and light for such purpose and was not suitably equipped with connections for attaching said tractor to the pole of said tank, the connection of said tractor being set low and near the ground and below the level of said pole, so that when said tractor was connected with said pole by means of a chain, furnished by defendant to plaintiff for that purpose, and the attempt was being made to turn said tank by the use of said tractor, the pull upon said tank was downward and sideways and the pull upon said tractor was upward and sideways, so that said tractor was liable to, and did, turn over and fall upon and injure plaintiff.

"2nd.   That defendant and its agents, negligently and carelessly furnished to plaintiff for the purpose of turning said water-tank wagon around and bringing same in, a Fordson tractor, when the said defendant knew, or by the exercise of ordinary care should have known, it was unsafe and unsuitable for such purpose and was dangerous to plaintiff, for that it, the said tractor was too small and light for such purpose and was not suitably equipped with connections for attaching said tractor to the pole of said tank, the connection of said tractor being set low and near the ground and below the level of said pole, so that when said tractor was connected with said pole by means of a chain, furnished by defendant to plaintiff for that purpose, and the attempt was being made to turn said tank by the use of said tractor, the pull upon said tank was downward and sideways and the pull upon said tractor was upward and sideways, so that said tractor was liable to, and did, turn over and fall upon and injure plaintiff."

The answer is a general denial, coupled with defenses of assumption of risk and contributory negligence. The facts alleged as constituting contributory negligence on the part of plaintiff are thus stated in the answer:

315 Mo.—68.

"First: That at the time plaintiff was requested to move said water tank the wheels of said water tank were deeply imbedded in the earth on which it stood, which fact was known to and seen by plaintiff, or by the exercise of ordinary care on his part could have been known and seen by plaintiff, but that plaintiff, notwithstanding the fact that said wheels of said water tank were deeply imbedded in the earth on which it stood, proceeded to and did attach said Fordson tractor to said water tank and attempted to haul and move said tank, with and by means of said tractor, without first removing or loosening the dirt and earth in which said water tank was then and there imbedded, thereby carelessly and negligently causing said tractor to turn over backwards and injure plaintiff.

"Second: That plaintiff knew, or by the exercise of ordinary care could have known, that if said Fordson tractor when attached to said water tank, was started in second speed, without first removing or loosening the dirt and earth in which the wheels of said water tank were imbedded, the weight of said water tank would cause said Fordson tractor to turn over backwards, but that plaintiff carelessly and negligently attached said Fordson tractor to said water tank, when the wheels of same were so deeply imbedded in the ground and earth on which it stood, and then and there proceeded to start said tractor in second speed, thereby carelessly and negligently causing said tractor to turn over backwards and injure plaintiff.

"Third: That plaintiff carelessly and negligently at the time of his injury undertook to and did start said Fordson tractor in intermediate or second speed when he knew, or by the exercise of ordinary care could have known, that the starting of said tractor in intermediate or second speed was liable to cause said tractor to turn over and injure plaintiff.

"Fourth: That the plaintiff negligently fed to the engine of said tractor an excessive amount of gas and negligently suddenly put the power on said tractor, and so negligently operated and handled said tractor that the same was turned over, and negligently failed to shut the power off when said tractor started to turn over."

The reply is a general denial of the allegations of the answer.

Plaintiff was forty-eight years of age and had been in the employment of defendant some two or three months prior to his injury. Plaintiff testified that his duties were to help in the laying of concrete mixtures, and "in fact, anything that I was ordered to do;" that he had previously done steam-fitting and plumbing and had operated stationary engines, traction engines, automobiles and tractors. Defendant's foreman described plaintiff's duties as operating the mixers, driving trucks, overhauling machinery, or "anything that might come up; he was a kind of a general utility man; he said he was a machinist and all-around mechanic, and was hired on the job for

that.'' Some time after plaintiff entered defendant's employ, defendant purchased a new Fordson tractor. Defendant's foreman testified that the Fordson tractor ''was on the job something like a month'' before the happening of the casualty. According to the testimony of defendant's foreman, the Fordson tractor had been used to pull the concrete mixer, to pull out and remove rocks and boulders, to haul wagons loaded with material, and to pull the water-tank wagon. Plaintiff testified that the tractor had been used to haul wagons loaded with material, to pull the road scraper or grader, and for hauling out mired trucks with a block and tackle; that he had never seen the tractor used in pulling the water-tank wagon and that the tractor had never before been used for that purpose. Plaintiff testified that he had operated or driven the tractor but three times, once to do some grading with a six-foot road-grader blade, once to haul a wagon about half filled with lumber, on which were a ''bunch of men,'' and lastly on the day he was injured. On one occasion he had assisted in pulling out a mired truck with the aid of the tractor and a block and tackle, which was attached to a telegraph pole for leverage, although on that occasion he had not personally operated the tractor, which appears to have been operated by a fellow-employee. Plaintiff testified that, before the purchase of the Fordson tractor in question, he had never operated a Fordson tractor and was not familiar with its mechanism. Both plaintiff and defendant's foreman testified that plaintiff had never pulled the water-tank wagon with the tractor before the day of plaintiff's injury.

About two or three weeks before the day of the casualty, the water-tank wagon had been used by defendant in supplying water for mixing concrete used in the construction of a bridge or culvert, and had been left standing in Manchester Road, at a distance of about three miles from defendant's construction camp. At the time the water-tank wagon had been hauled to its location and left standing in the road, the ground or roadway was muddy, but subsequently the ground had been dried by the sun, leaving the tank wagon partially mired in the road. How deeply the tank wagon was mired does not appear from the evidence in the record. Plaintiff testified that the tank wagon had been hauled to its location with mules, but defendant's foreman testified that the tank wagon had been hauled to its location by the Fordson tractor. Before the purchase of the tractor, it appears that the tank wagon had been hauled at times by a large Mack automobile truck and at other times by a pair of mules. The approximate weight of the tank wagon, when empty, was given by plaintiff as 2,000 pounds and by defendant's foreman at 2500 to 3,000 pounds. Another witness estimated its weight at about 3500 pounds. According to the testimony of several witnesses, the tank wagon contained from one-half to three-fourths of its capacity of

water at the time of the casualty. The capacity of the tank was 750 gallons. The United States standard gallon of water weighs approximately 8⅓ pounds, and, using that standard of weight and measurement, the combined weight of the tank wagon, with the water contained therein, was approximately between 5,000 and 8,000 pounds at the time of the casualty. The evidence tends to show that the weight of the Fordson tractor is about 2425 pounds, and that the horse-power of the tractor engine is about 30 or 35.

It appears from the testimony that, on the day of the casualty, one Woodruff was defendant's foreman or superintendent in charge of the work, and one Harrilson was the secretary and a director of defendant corporation and was in charge of the camp commissary. One Weber was employed by defendant as the regular operator of its trucks and tractors. Early in the morning of that day, the foreman Woodruff ordered Weber to take the Fordson tractor from the construction camp to the point in Manchester Road where the water-tank wagon had been left standing, with directions to hitch the tractor to the tank wagon and pull the tank wagon back to camp. Weber was also ordered to take another employee with him to a certain detour bridge, located at some point on the road between the camp and the tank wagon, and to leave the fellow-employee there to take up the detour bridge and load the lumber from the bridge on a wagon, while Weber proceeded with the tractor to pick up the tank wagon. Weber was ordered to pick up the tank wagon, bring it back to the detour bridge, and there to attach the wagon load of lumber to the tank wagon and bring them both back to the construction camp, provided the tractor would pull both the tank wagon and the wagon load of lumber; but if the tractor would not pull both (for Woodruff "figured that it might not pull them both") then Weber was to bring back the tank wagon and leave the lumber wagon behind. Harrilson had some errands to perform in the city of St. Louis and asked Woodruff to send a man along with him. Woodruff, defendant's foreman, told Harrilson to take the plaintiff, Compton, with him to St. Louis. When Harrilson asked plaintiff to accompany him to St. Louis, plaintiff said he was unacquainted with the city and suggested to Harrilson that he take Weber with him instead of plaintiff. Weber did accompany Harrilson to St. Louis. Plaintiff testified positively that Harrilson ordered him to take the Fordson from the camp and bring in the tank wagon, while Harrilson testified that plaintiff merely suggested that Harrilson take Weber to the city instead of plaintiff and that he (Harrilson) thereupon told plaintiff "it does not make any difference which one goes along." Harrilson said that was the only conversation he had with plaintiff concerning the matter. Weber testified that he had orders from the foreman, Woodruff, "to go and get the water tank and, if I could, bring a load of bridge lumber

along with it, and I came up to the camp in the meantime, and Mr. Compton (plaintiff) came up with Harrilson, I don't know where they came from, and he (plaintiff) said that he didn't know anything about St. Louis, they wanted to go to St. Louis, he didn't know but very little about it, and that he would go and get the water tank and I should go to St. Louis and it was all right with Mr. Harrilson. That is all there was said between us. I said, 'It is all right with me; if it is all right with Harrilson, it is all right with me.' . . . He (Harrilson) was not on the spot at the time Mr. Compton (plaintiff) and I had the conversation.'' The foreman, Woodruff, testified that he had given an order to Weber, but had given no order to plaintiff to use the Fordson tractor, and that, later in the morning, he saw plaintiff with the tractor and ''asked him how he came to be on the tractor. He (plaintiff) said that Harrilson and Weber went into town together and he was driving the tractor. Q. That was satisfactory as far as you were concerned? A. Yes, sir, as far as I was concerned. Q. And you knew what he was going to do with the tractor; you knew where he was going with this tractor? A. Yes, sir. He said he was going to get the water tank and this load of lumber. Q. He told you that Harrilson had told him to get the water tank and the load of lumber? A. Yes, sir. Q. And you let him go on? A. Yes, sir; certainly.''

Plaintiff testified, on direct examination, that, pursuant to Harrilson's orders, he proceeded with the Fordson tractor to the location of the water-tank wagon, which was headed westwardly upon the road; that, on arriving there, he pulled the plug out of the water tank to let the water run out; the idea (plaintiff testified) was to let the water run out as he was pulling the tank along the road; plaintiff ''wanted to save as much time'' as he could; he then hitched the draw-bar of the tractor to the pole or tongue of the tank wagon by means of a chain, and pulled the pole and front wheels of the tank wagon, which turned upon a horizontal fifth-wheel under the bed of the wagon, so that the front wheels ''cut under'' the wagon, and the pole, or tongue, of the wagon was extended at an angle of about forty-five degrees with the tank wagon; he then unhitched the tractor and ''backed the tractor up to it and I pulled the pole down and hitched it as close as possible to prevent the tongue from running on me going down a hill;'' after hitching the tractor to the pole of the wagon the second time, plaintiff testified that he then applied the power to the tractor, which reared up rapidly and turned over on its rear wheels, or upside down, pinning plaintiff to the ground under the tractor. Plaintiff testified further:

''Q. You knew how to operate the Fordson, did you? A. Yes, sir, I operated it.

"Q. Now, in operating this Fordson on this particular day when you had it attached to the tank, how did you start up, at what speed? A. I started it in low.

"Q. You started in low speed? A. Yes, sir, naturally, anybody would start in low.

"Q. How much gas did you give it? A. Well, I gave it enough to start it, there is no way to gauge how much I gave it.

"Q. And you started in low? A. Yes, sir.

"Q. Had you shifted (gears) at all when it turned over? A. No, sir.

"Q. It was in low when you turned over? A. Yes, sir, as far as I know it was.

"Q. Well, when it turned over what happened with reference to the power? A. When I seen it was over, I had my hand on the gas, on the throttle, at the time and shut it off as quickly as I could."

On cross-examination, plaintiff testified:

"Q. What was the condition of the earth there on the day when you went out to haul in this water tank? A. It had been rough, it had been muddy and dried up.

"Q. Was the earth around the wheels of this water tank dry or was it yet muddy? A. No, sir, it was not muddy, nor it was not dry.

"Q. It was not muddy? A. No, sir.

"Q. There had been sunshine and the earth was packed? A. Yes, sir.

"Q. Did you notice the wheels of this water tank being in there mired up? I believe you say in your petition it was mired up? A. Yes, sir.

"Q. You noticed that? A. Yes, sir.

"Q. Did you make any effort to loosen this dirt around the wheels of this water tank before you hooked your Fordson tractor to it? A. No, sir.

"Q. You made no effort to do so? A. No, sir.

"Q. Or even going there and kicking with your heels around it? A. I had loosened the front end of it with the tractor.

"Q. You had loosened the front end of it with the tractor? A. Yes, sir, with the tractor when I hitched to it and brought it around, consequently it loosened the hind wheels; it did loosen the hind wheels; when I pulled the front end around naturally the hind wheels came loose. . . .

"Q. Do you know where your right foot was when that tractor started to stand up on its hind wheels? A. I do. On that pedal; the clutch pedal to disengage the motor or easing it right in.

"Q. When it started to come up, what did you do? A. When I discovered it coming up it was too late to do anything. I tried to get out of the way.

"Q. You did not do anything? A. I didn't have time, it came over that quick.

"Q. Now you were easing in the clutch, you say? A. Yes, sir.

"Q. And giving her gas? A. Yes, sir.

"Q. And she started up? A. Yes, sir.

"Q. Now do you mean that you kept your hands and feet in the position they were at the time that the front end of the tractor started up? A. Well, as near as I can remember I did, just in that position.

"Q. You might have eased it a little bit more, mightn't you, as it started up? A. Well, it had started and was pulling to dig itself out.

"Q. It was pulling? A. Yes, sir, but it was not getting nowhere, but the drivers was turning.

"Q. When it was going nowhere, why didn't you look back to see about the wheels on that tank? A. I was looking back all the time; that is why I did not discover the tractor was on me until it was right on me.

"Q. You were watching the tank? A. Naturally, any man starting will do that; I was looking to see how it was coming. . . . I was looking back at the tank.

"Q. If you had been looking towards the front end of your tractor, you would have noticed it coming up and you could have disengaged your foot from easing the clutch in? A. Yes, sir.

"Q. I say, if you had been watching the front end of this tractor and had noticed this tractor coming up, you knew that the proper thing to have done would have been to put this—A. To shut her off?

"Q. Yes, sir, to shut her off? A. You bet I know that. . . .

"Q. You were sitting in the seat like this figure on this model? A. Yes, sir, sure.

"Q. And you had your hand on the steering wheel, did you? A. Yes, sir.

"Q. And as this was rearing up you came back that minute? A. Yes, sir, sure. . . .

"Q. And then you noticed it was rearing up? A. Yes, sir.

"Q. Now that would be about how high, considering the ground here, on an angle of what distance from the ground, about forty-five degrees would you say? A. Yes, sir.

"Q. About forty-five degrees? A. Yes, sir, about like that.

"Q. You noticed when it was rearing up? A. Yes, sir.

"Q. Now, when you say it was rearing up, why didn't you put that clutch lever or pull it over here in neutral and let it lay down? A. Simply because this came over so fast, and I fell away from that. . . .

"Q. Now, then, in order to feed gas to that engine you regulate a little lever that works on notches on the right hand side of your steering wheel, just above the point where the steering rod goes through that instrument board, don't you? A. Yes, sir.

"Q. And that is set something in the nature of a half circle, is it not, is that true? A. Yes, sir, it is set in a half circle.

"Q. These notches hold that throttle in position when it is moved from point to point? A. Yes, sir. . . .

"Q. Now how many notches of gas did you give on this occasion? A. I never did count them notches, I never stopped to count them. You just move it according to what you need.

"Q. You say you don't know how much gas you did give it? A. No, sir.

"Q. You don't know? A. No, sir.

"Q. You just gave her plenty of gas and she turned over, is that right? A. That was my intention, to give her plenty of gas, enough to pull it out of there if I could."

Plaintiff introduced the testimony of two tractor mechanics who had operated and were familiar with the operation of Fordson tractors, which testimony tended to prove that a Fordson tractor, when subjected to a heavy load, such as the weight of the tank wagon and its water content, will rear up and turn over on its hind wheels.

Witness Weber testified for defendant that, shortly after plaintiff was injured, he went to the scene of the casualty, where he found the tractor lying upside down in the road and that he righted the tractor; that he found the gear lever set in second speed; that, after righting the tractor, he threw out the clutch, put the gear in low speed, fed the engine a little gasoline and pulled the tank wagon out without any difficulty; that the tank wagon was then about one-fourth filled with water; that he proceeded with the tractor and tank wagon to the detour bridge, about one-fourth mile distant, where he attached the loaded lumber wagon, whose weight (witness said) was about 5,000 pounds, and pulled both the tank wagon and the wagon load of lumber to the town of Ellisville, a distance of three-fourths of a mile. Witness also testified that he was an automobile mechanic, had operated Fordson tractors and was familiar with their operation, but had never pulled the tank wagon before with the Fordson tractor. He testified further:

"Q. Now in order to pull a load, I wish you would just describe the proper manner of attaching a Fordson tractor to a heavy load, say of 10,000 to 15,000 pounds. A. If you pull a heavy load with a Fordson tractor, you have to release the clutch and put it in low speed and then give it gas enough to keep from killing your motor and let your clutch in slow.

"Q. Will a Fordson tractor stand upon its rear wheels and lift the front end when it is in low gear? A. Yes, sir.

"Q. Would it do that in high gear? A. No, sir.

"Q. How about second speed? A. It will in second speed.

"Q. Now then what effect has the giving of a considerable amount of gas and a quick start upon a Fordson tractor? A. Well, it depends on the speed, which speed you are in.

"Q. Now, if the tractor starts to come up on the end, what is the proper way to handle it when it begins to buck up on one end? A. Well, close the throttle and throw the clutch, whichever you can do the quickest.

"Q. Will either of these actions on the part of the operator cause it to go down? A. Yes, sir, cause it to stop and go down.

"Q. Now, if you get a Fordson tractor in low gear and give her gas and pull some heavy object and that object is not moving along with the tractor, it is still stationary, and you have sufficient pull on it to lift the front end and still you are in low gear, will that rear up rapidly or slowly when it is in low gear? A. It will rear up slowly.

"Q. And if it is in second speed will it rear up rapidly or slowly? A. It will rear up fast and quick.

"Q. Did you have any experience in Fordsons rearing up? A. I had them rear up six or seven inches.

"Q. You never had any experience of it rearing so fast that you could not close the throttle or throw the clutch? A. No, sir."

Defendant introduced the testimony of several expert witnesses who had operated Fordson tractors. These witnesses testified, in substance, that a Fordson tractor will rear up on the hind wheels if the operator "races" the engine by feeding it too much gasoline, or if the operator lets the clutch into gear too quickly; that the proper way to operate a Fordson tractor is to start the engine, set the gears in low speed, let the clutch in slowly and feed the engine just enough gasoline to keep the engine from stalling. One of defendant's witnesses testified that a Fordson tractor, which he was operating in a demonstration, had pulled a load of fifteen tons on a paved city street, and another witness testified that he had pulled heavy loads with a Fordson tractor.

There is apparently no controversy as to the extent or severity of plaintiff's injuries, which the evidence shows are of a serious and permanent nature. The evidence tends to show that plaintiff was pinned under the overturned tractor for one hour or more before being released and that he was taken to a hospital in St. Louis, where he was confined for fifteen weeks, during which time he received surgical and medical treatment. His physician testified to the extent, severity and permanency of his injuries.

Defendant requested the giving of peremptory instructions in the nature of demurrers to the evidence at the close of plaintiff's case in chief and again at the close of all the evidence, which peremptory in-structions the trial court refused to give, and exceptions to the court's ruling thereon were duly saved by defendant.

While plaintiff alleged in his petition that the Fordson tractor was too small and light for the purpose for which plaintiff was or-dered to use the tractor, he also alleged as a ground of negligence that the tractor was not suitably equipped with connections for attach ing the tractor to the pole of the tank wagon. The latter charge or specification of negligence, however, was abandoned by plaintiff, and he submitted his case to the jury solely upon the theory that defend-ant was negligent in furnishing him, and in ordering him to use, a Fordson tractor which was too light for the use and purpose of haul-ing the water-tank wagon. Plaintiff's main instruction, presenting his theory of recovery, was hypothesized upon that fact. The trial court gave twelve instructions on behalf of defendant, submitting to the jury its several theories of defense. Nine of the jurors re-turned a verdict for plaintiff in the sum of $10,000, upon which judg-ment was entered. After unsuccessfully seeking a new trial, defend-ant has appealed to this court.

I. Appellant assigns error in the refusal of the trial court to peremptorily instruct the jury to return a verdict for defendant. Plaintiff, in his petition, charged defendant with two specific acts of negligence: (1) that defendant furnished plaintiff, and **Demurrer** ordered him to use, a Fordson tractor for the purpose **to Evidence.** of turning around and bringing in a heavy water-tank wagon, which tractor was unsuitable and dangerous for such pur-pose, and was liable to turn over, in that said tractor was too small and light for such purpose; and (2) that said tractor was not suit-ably equipped with proper connections for attaching the tractor to the water-tank wagon. Inasmuch as plaintiff abandoned the second or latter charge of negligence, the sole question to be considered by us respecting this assignment of error is whether there is any sub-stantial evidence of negligence on the part of defendant in furnish-ing, and ordering plaintiff to use, a tractor which was too small and light for the task which plaintiff was ordered to perform with the aid of the tractor.

In approaching that question, we must bear in mind certain es-tablished principles of law bearing on the relation of master and servant. It is the duty of the master to use ordinary care to furnish the servant with reasonably safe appliances with which to do the work assigned to him by the master. The rule is thus stated in 39 Corpus Juris, 308: "It is the positive duty of a master to furnish

his servant with reasonably safe instrumentalities wherewith, and places wherein, to do his work. . . . The duty imposed is a continuing one, and in the performance of these obligations imposed by law, it is essential that regard should be had not only to the character of the work to be performed, but also to the ordinary hazards of the employment, and the servant may assume that the master has performed such duty." On the other hand, the master is not an insurer of the safety of the appliances furnished to the servant, nor is he an insurer of the safety of the servant in using the appliances furnished. [39 C. J. 313; Van Bibber v. Swift & Co., 286 Mo. 317; Goransson v. Mfg. Co., 186 Mo. 300.] It has been said by this court that "the legal test of reasonable safety in machinery or methods is customary use by those engaged in like employment and work." [Coin v. Lounge Co., 222 Mo. 488; Williams v. Ice & Cold Storage Co., 214 S. W. 385.] Nor does the mere fact of an accident and consequent injury to the servant, as a general rule, make out a prima-facie case of the master's negligence. [39 C. J. 972; Fuchs v. St. Louis, 167 Mo. 620.]

Plaintiff alleged in his petition a specific act of negligence, so that the doctrine of *res ipsa loquitur* is not applicable in this case, for reliance by plaintiff on that doctrine is precluded by the specific allegations of his petition. [McGrath v. Transit Co., 197 Mo. 97; Byers v. Essex Investment Co., 281 Mo. 375; Pippin v. Construction Co., 187 Mo. App. 360.] Having alleged specific negligence, it was necessary for plaintiff to make out a prima-facie case upon the specific negligence charged in his petition. [Pippin v. Construction Co., 187 Mo. App. 360.] In other words, the burden rested on plaintiff to establish the specific negligence charged by a preponderance of the evidence. [39 C. J. 987.] But, as said by this court in Baird v. Citizens' Railway Co., 146 Mo. l. c. 281, quoting from Wharton on Negligence, sec. 420: "Negligence is not a fact which is the subject of direct proof, but an inference from facts put in evidence." Or, to state the rule somewhat differently, as we did in Blanton v. Dold, 109 Mo. l. c. 75: "Negligence, like any ultimate fact in issue, may be established as well by reasonable inferences from other facts as by more direct means of proof." [See, also, Adams v. Street Railway Co., 174 Mo. App. 5, and Gerber v. Kansas City, 304 Mo. 157.]

As said in 39 Corpus Juris, 1054: "Just what evidence will be deemed sufficient to show negligence on the part of the master must of course depend upon the facts and circumstances of the particular case. There must be a preponderance in favor of plaintiff, but this may arise either circumstantially or directly; and in any event the question should be submitted to the jury where there is any evidence whatever which has a tendency to show the negligence alleged." Furthermore, "a demurrer to plaintiff's evidence accepts that evi-

dence as true, whether contradicted or not by defendant's proof, so long as it is not impossible as opposed to the physics of the case or entirely beyond reason. It takes defendant's testimony as untrue where contradicted by plaintiff's proof. It leaves to the jury to settle the weight due the testimony, the credit due the witnesses and to reconcile contradictions, if any, in proof. So, it allows to plaintiff's case the benefit of every reasonable inference of fact arising on all the proof.'' [Stauffer v. Railway Co., 243 Mo. 1. c. 316.]

In the light of the foregoing principles, was there any substantial evidence that defendant was negligent in the manner and respect charged in plaintiff's petition? If so, then plaintiff was entitled to the submission of his case to the jury. There is some conflict in the testimony as to whether plaintiff was ordered by defendant's agent to operate and use the tractor, or whether (through some arrangement with his fellow-employee, Weber, unbeknown to defendant or its foreman) plaintiff volunteered to perform the task of bringing back the tank wagon with the tractor, which task defendant, through its foreman, had assigned to Weber. If plaintiff volunteered to use the tractor without being ordered so to do by defendant, and therefore was acting outside the scope of his employment, it might be that defendant, under such circumstance, owed him no duty in respect to the fitness and safety of the tractor. But it is unnecessary for us to consider or to rule that question, for plaintiff testified positively that he was ordered by Harrilson, an officer of defendant corporation, ''to take the tractor and pick up this tank and bring it in,'' and Woodruff, defendant's foreman, testified to having seen plaintiff driving the tractor shortly prior to his injury, knew that ''he was going to get the water tank and load of lumber,'' and acquiesced therein. The question, whether defendant furnished plaintiff with the tractor and ordered him to use it in hauling the tank wagon was clearly one of fact for the jury.

Plaintiff testified that he had never operated a Fordson tractor before he went to work for defendant; that he knew nothing about its mechanism; that he had operated the Fordson tractor in question but three times, including the time he was injured; that he had never, at any time prior to his injury, used the tractor in hauling the water-tank wagon; that the tractor had never been used before the day of the casualty for the purpose of hauling the water-tank wagon; that a large Mack automobile truck had previously been used to move and pull the tank wagon, and that the tank wagon at other times had been hauled by mules; that, at the time of the casualty, upon putting the power on the tractor in an attempt to move the tank wagon, the tractor immediately turned over and fell upon him; and, that the tractor turned over so quickly he ''didn't have time to do anything.'' Defendant's foreman, Woodruff, is the only witness who testified that

the tractor had been used previously in hauling the tank wagon and Woodruff admitted that plaintiff had never used the tractor in hauling the tank wagon until the day he was injured. Defendant's witness Weber, who appears from the evidence to have been the regular operator of defendant's trucks, testified that he (Weber) had never used the tractor in hauling the tank wagon until after the happening of the casualty in which plaintiff was injured. So that, while there is the sole testimony of defendant's foreman that the tractor had previously been used in hauling the tank wagon, opposed to the foreman's testimony is the positive testimony of plaintiff that the tractor had never been used for the purpose of hauling the tank wagon until the time of plaintiff's injury. Defendant offered no evidence in corroboration of the foreman's testimony and no other witness testified that the tractor had been used in hauling the tank wagon prior to plaintiff's injury. If plaintiff's testimony to the effect that the tractor had never been used in moving or hauling the tank wagon before the time of his injury is true, and we must accept it as true for the purposes of the demurrer to the evidence, then a new function was imposed upon the tractor, and it was put to a use to which it had not theretofore been put. In LaBatt on Master and Servant (2 Ed.), Vol. 3, p. 2465, sec. 923, the text-writer says: "If new functions are imposed upon an instrumentality by the master himself or his representative, and the servant is thereby exposed to undue risks, the master must answer for any injury resulting from those risks, and cannot excuse himself by showing that the instrumentality was a suitable one for the performance of the work for which it was originally supplied."

Evidence was adduced as to the weight and horse-power of the Fordson tractor and as to the weight of the tank wagon and its water content. Testimony of tractor mechanics familiar with the mechanism and operation of Fordson tractors was adduced by plaintiff tending to show that a Fordson tractor, when subjected to a heavy load, such as the weight of the tank wagon and its water content, will suddenly rear up and turn over. The testimony of other witnesses familiar with the operation of Fordson tractors was adduced by defendant, and an inference which may reasonably be drawn from their testimony is that a Fordson tractor has a propensity or tendency to rear up on its hind wheels when subjected to a heavy load. For instance, one of defendant's expert witnesses testified:

"Q. Will a Fordson tractor stand up in front? A. Yes, sir.

"Q. How about other tractors? A. Any gasoline tractor will do it; any sort of tractor will do it, a traction engine will do it. . . .

"Q. They do rear up on you? A. I have reared them.

"Q. I did not ask you that. Can they not rear up on you? A. Yes, sir.

"Q. And you know how to handle them? A. Yes, sir.

"Q. Have you ever known tractors to turn completely over in low gear? A. I have heard of it; yes, sir."

Another of defendant's witnesses testified on cross-examination:

"Q. Now you say whenever you operated a tractor you always prepared to release the clutch right away? A. Yes, sir, while on a heavy pull, if there is anything that looks dangerous.

"Q. Because they rear up? A. Yes, sir, they do.

"Q. And whenever they are attached to a heavy pull they rear up? A. Not necessarily; not every time.

"Q. But the great majority of times? A. No, sir; not the majority of times.

"Q. How many times? A. It just depends on the load that the tractor is pulling."

Defendant offered no testimony tending to show that Fordson tractors are customarily used by those engaged in like employment and work for purposes similar to that for which the plaintiff was required to use the tractor in the instant case.

From a careful examination and consideration of all the evidence and circumstances in the case, and allowing to plaintiff the benefit of every reasonable inference to be drawn therefrom, we cannot say, as a matter of law, that there was an entire failure of proof of the specific negligence charged. We are of the opinion that the question of defendant's negligence in the respect charged was an issue of fact for the determination of the jury upon proper instructions given to them for their guidance.

Defendant contends that, if the Fordson tractor was too light for the purpose of hauling the water-tank wagon, such defect or insufficiency was a patent one, open as much to the observation of plaintiff as it was to the defendant employer and that plaintiff must be held to a knowledge of such defect or insufficiency in the tractor, whether he actually knew of the same or not; and, furthermore, that the servant, upon entering the employment of the master, assumes not only the risks incident to his employment, but all dangers which are apparent and obvious as a result thereof. Defendant relies upon Nugent v. Milling Co., 131 Mo. 241, and Mathis v. Stock Yards Co., 185 Mo. 434, in support of its contention. In both cited cases, however, the danger in using the appliance or instrumentality was clearly and indisputably obvious to the servant. In the Nugent case, plaintiff admitted, by his own testimony, that he knew there was danger in using the machine or appliance in the manner he attempted to use it. In the Mathis case, plaintiff was injured by the slipping of a loose and unfastened plank or board, upon which he was standing in the performance of his duties, the ends of the plank resting upon the tops

of two steam chests. The plank or appliance was of the simplest char-acter and had been used by plaintiff with safety in the performance of the same duties a number of times before his injury. Although a majority of the court, in that case, ruled that plaintiff appreciated the danger in using the plank and therefore assumed the risk as a matter of law, yet three of the members of the court, in a dissenting opinion, expressed their belief and conviction that the appliance was not so glaringly or threateningly dangerous that a person of ordinary prudence would refuse to use it, and hence were of opinion that the issue whether plaintiff assumed the risk was properly submitted to the jury as a question of fact.

The settled and established rule in this State is that while the servant assumes the ordinary and usual risks incident to his employment, yet the servant never assumes a risk where such risk is the outgrowth of the master's negligence in furnishing, for the performance of the servant's work, an instrumentality or appliance which is unsuitable or defective; in other words, there can be no assumption of risk occasioned by the negligence of the master, although the servant, in such event, may be guilty of contributory negligence in using the appliance furnished him by the master, as where the appliance or instrumentality negligently furnished by the master is so glaringly and patently defective that an ordinarily prudent servant would not have used it. [Williams v. Pryor, 272 Mo. 613; Fish v. Railway Co., 263 Mo. 106.] It is equally well settled in this State that, unless the danger occasioned by the master's negligence is so glaring and obvious to the servant as to threaten immediate and almost certain injury, the servant cannot be held guilty of contributory negligence, as a matter of law. [Thorpe v. Railway Co., 89 Mo. 650; Jewell v. Bolt & Nut Co., 231 Mo. 176; Edmondson v. Hotels Statler Co., 306 Mo. 216.] As we have said, there is, in the record before us, substantial evidence of the master's negligence in the respect charged in plaintiff's petition, so that the question resolves itself into whether plaintiff was guilty of contributory negligence, as a matter of law, in using the tractor for the purpose for which he was ordered to use it. The tractor furnished to the plaintiff was a complex machine or instrumentality. It was not such a simple tool or appliance as would enable the user thereof to easily and readily determine whether it was defective or unsuitable for the purpose for which it was furnished. Plaintiff, according to his positive testimony, had never used the tractor for the purpose of moving or hauling the tank wagon and had never seen it used for that purpose. It does not appear from the record that plaintiff had ever seen the tractor "rear up" (as the witnesses expressed it), or that he knew of the apparent propensity of the tractor so to do. It certainly cannot be said to be conclusively shown by the evidence herein that the danger

of using the tractor in moving the tank wagon was so glaring and obvious that no reasonably prudent man would have attempted to use it for that purpose. Hence, it cannot be said that plaintiff was contributorily negligent, as a matter of law. [Williamson v. Light & Power Co., 281 Mo. 544.] Whether plaintiff was contributorily negligent in using the tractor in performance of the task assigned to him was a question of fact for the determination of the jury.

It is also contended by defendant that the evidence discloses that plaintiff placed a severer strain on the tractor than was contemplated by the master in that plaintiff failed to remove the earth about the wheels of the tank wagon, when he knew that the wheels of the wagon were imbedded in the earth. Hence, it is insisted that plaintiff was guilty of contributory negligence, as a matter of law, in failing to remove the earth about the wheels of the tank wagon before attempting to move the wagon with the tractor. We do not regard plaintiff's testimony respecting that fact as sufficient, in and of itself, to justify the trial court, or this court, in holding that plaintiff was contributorily negligent as a matter of law. While plaintiff did testify that the tank wagon was mired and that he made no effort to loosen the earth around the wheels of the tank wagon before attaching the tractor to the wagon, yet later in his examination he testified further: "I had loosened the front end of it with the tractor. Q. You had loosened the front end of it with the tractor? A. Yes, sir, with the tractor when I hitched to it and brought it around, consequently it loosened the hind wheels; it did loosen the hind wheels; when I pulled the front end around naturally the hind wheels came loose." Allowing to the above quoted testimony every reasonable inference and intendment, it might well be inferred therefrom that the wheels of the tank wagon had been loosened from the earth in which the wagon was mired before plaintiff attached the tractor to the wagon the second time, and, according to plaintiff's testimony, the tractor did not overturn until it had been hitched or attached to the wagon the second time. We think that the question whether defendant was negligent in failing to remove the earth about the wheels of the tank wagon before attempting to move the tank wagon with the tractor was likewise one for the jury. That issue appears to have been fairly and fully submitted to the jury by the instructions given on behalf of defendant.

Finally, defendant contends that plaintiff was contributorily negligent, as a matter of law, because of the manner in which he operated the tractor. Plaintiff's own testimony as to the manner in which he operated the tractor at the time in question apparently accords in the main with the method of operation which the expert witnesses in the case described as a proper method under like or similar conditions. He testified quite positively that in starting the tractor he

put the tractor in low gear. While plaintiff said he did not know how much gasoline he fed to the engine and that it was his intention "to give her plenty of gas, enough to pull it out of there if I could," nevertheless we cannot say that the evidence conclusively shows that plaintiff applied an excessive amount of power to the tractor. While it is also true that certain of defendant's expert witnesses testified that, if the tractor failed to move the load and the front end started to rear up from the ground, the operator should immediately shut off the gasoline or throw out the clutch, yet plaintiff testified that the tractor reared up and turned over so quickly that he "did not have time to do anything" and that he "fell away from the clutch pedal." Where reasonable minds may differ as to the inferences to be drawn from facts and circumstances tending to prove contributory negligence, the question is one for the jury. [Butz v. Construction Co., 199 Mo. l. c. 287; Gancy v. Kansas City, 259 Mo. l. c. 662.] So we think reasonable minds might differ respecting plaintiff's contributory negligence in the instant case. The trial court, in our opinion, did not err in refusing to peremptorily instruct the jury to return a verdict for defendant, and the assignment of error must be ruled against appellant.

II. Appellant assigns error in the admission of certain testimony. A witness for plaintiff was allowed to testify respecting the mechanical arrangement and location of the gears of the Fordson tractor. It is claimed that error was committed by the trial court in the reception of this testimony for the reason that the petition does not charge that the gears or mechanical parts of the tractor were defective, and therefore that the testimony is broader in its scope than the allegations of the petition. However, the specific ground of objection now urged to this testimony upon appeal was not presented or urged in the trial court. Hence, it will not be considered by this court on appeal. [Kehlenbrinck v. St. Louis, 232 S. W. 124; Baldwin v. Railways Co., 231 S. W. 280.]

**Admission of Evidence.**

Another assignment of error made is that the trial court erred in admitting, over objections and exceptions of defendant, a part of the testimony of plaintiff's witness Burnett, referred to in the assignment as being found and set out on certain pages of the printed record. Appellant, however, has not attempted to brief the matter assigned and we have searched the brief in vain for a single citation of authority in support of the assignment. The matter is not argued or even referred to in appellant's printed argument. Under our rulings, the matter is not entitled to consideration and will be treated as abandoned by appellant. [Peak v. Taubman, 251 Mo. 390, 438;

315 Mo.—69.

National Bank of Commerce v. Laughlin, 305 Mo. 8; State v. Whitsett, 232 Mo. 511.] However, we may say that we have examined the testimony referred to and find no reversible error in its admission.

III. Lastly, appellant complains of the giving of plaintiff's Instruction 1, which submitted plaintiff's theory of recovery to the jury. The complaint made against this instruction is that it is broader in its scope than the petition and the evidence in that the

**Instruction.**  instruction allowed the jury to return a verdict for plaintiff if they found that the tractor was unsuitable for the purpose for which it was furnished by defendant, without requiring the jury to find that it was unsuitable because it was too light for such purpose. However, an examination of the language of the instruction does not lend support to appellant's criticism. The instruction required the jury to "find and believe from the evidence that said tractor was *not suitable* for the purpose of hauling said wagon, if you so find, *because it was too light* and when being used for such purpose it was dangerous, and if you find that *because it was too light* it was liable to turn over and injure plaintiff and that defendant, or said Harrilson, in directing plaintiff so to do, if you so find, knew or by the exercise of ordinary care could have known that said tractor was *so unsuitable* for said purpose and that said *tractor was too light* to haul said water tank wagon, and was liable to turn over and was dangerous to plaintiff when being used for said purpose," etc. The instruction cannot be said to be broader in its scope than the allegations of the petition, and the assignment must be disallowed.

No complaint is made respecting the amount of the verdict, and defendant's several theories of defense appear to have been fully and fairly submitted to the jury by the twelve separate instructions given by the trial court at its request and on its behalf. Finding no reversible error in the record, the judgment must therefore be affirmed, and it is so ordered. *Lindsay, C.,* concurs.

PER CURIAM:—The foregoing opinion by Seddon, C., is adopted as the opinion of the court. All of the judges concur, except *Graves, J.,* absent.