JOSEPH MORRIS v. ATLAS PORTLAND CEMENT COMPANY and J. H. RUCH, Appellants.—19 S. W. (2d) 865.

Division One, July 30, 1929.

*George A. Mahan, Dulany Mahan* and *Ezra T. Fuller* for appellants.

*Chas. P. Noell* and *Hay & Flanagan* for respondent.

SEDDON, C.—Action to recover damages for personal injuries suffered by plaintiff while in the employment of defendant Atlas Portland Cement Company, and alleged to have resulted from the negligence of defendant corporation and its foreman and vice-principal, J. H. Ruch. The petition thus states plaintiff's cause of action:

"That on or about the 14th day of October, 1924, and long prior thereto, said defendant (corporation) had adopted and was using in its quarry and plant in moving the quarried rocks cars, loaded by a steam shovel, which cars were placed and moved on tracks by means of a dinky-engine; that the defendant Earl Sampson is and was the defendant company's engineer in charge of said shovel in the loading of said cars, and the defendant J. H. Ruch is and was the

foreman and vice-principal of the defendant company in charge of the operation of the quarry, including the loading of said cars; that on or about the date aforesaid, and prior thereto, plaintiff was in the employ of the defendant company as a switchman, and was required by the defendant company in the performance of his duties to be in said plant about and in close proximity to the cars loaded and moved by the defendants as aforesaid, as defendants knew, and that defendant habitually overloaded said cars, placing thereon large rocks and boulders over and above the limited capacity thereof, which when so placed were loose and unsupported and likely to roll about and to fall therefrom; that on the date last aforesaid the defendant Earl Sampson had loaded a certain car, along with others, to its reasonable capacity; and that thereafter the defendant J. H. Ruch, foreman and vice-principal of the defendant company, in the performance of his duties as such, negligently and carelessly ordered the defendant Earl Sampson to place upon said loaded car additional rock, including a certain large boulder, in excess of the reasonable capacity of said car, when the defendants knew, or by the exercise of ordinary care would have known, that said boulder so placed was loose and unsupported and likely to roll about and fall from said car and strike persons, including plaintiff, in the course of their ordinary duties. That thereafter plaintiff was required to be at a place near said car loaded as aforesaid, and that as the direct result of the negligence and carelessness of defendants as aforesaid, said large boulder fell from said car with great force and violence, falling upon and striking plaintiff as aforesaid, directly thereby causing'' plaintiff's injuries.

The amended answer of defendants is a general denial, with pleas of contributory negligence and assumption of risk, and the further plea that, if plaintiff received any injuries in the manner alleged in the petition, then such injuries, if any, were caused by the acts of plaintiff's fellow-servants and co-employees. The reply is a conventional general denial of the averments of the answer.

The action was dismissed as to the defendant Earl Sampson, during the course of the trial. A submission of the cause to a jury resulted in a verdict of ten jurors in favor of plaintiff and against the remaining defendants, Atlas Portland Cement Company and J. H. Ruch, assessing plaintiff's damages in the sum of $20,000, and judgment was entered in accordance with the verdict. Upon consideration of a motion for a new trial and a motion in arrest of judgment, duly filed by both said defendants, the trial court ordered the plaintiff to remit from the amount of the verdict the sum of $6500, under penalty of sustaining the defendants' motion for a new trial, whereupon plaintiff entered a remittitur of $6500 in pursuance of the order of the trial court, and the defendants' motions for a new

trial and in arrest of judgment were overruled, the original judgment was set aside, and a new judgment was entered in favor of plaintiff and against defendants for the sum of $13,500, with interest from March 10, 1926, the date of the original judgment. Both defendants were allowed an appeal to this court from the judgment last entered.

The evidence tends to show that plaintiff was employed by defendant corporation as a switching foreman in its quarry and cement plant located at or near Ilasco, a town distant about two and one-half miles south of the city of Hannibal. At the place in question, the defendant corporation operates a quarry, which is on top of the bluff overlooking the Mississippi River. The bluff consists of limestone strata, which are loosened and broken on the top of the bluff by blasting. After the limestone rock is loosened and broken by blasting, temporary or removable railway tracks are constructed and laid, leading into the pits where the loosened rock remains after having been blasted from the top of the bluff. The series of parallel railway tracks leading to each of such pits is called a "cut," and plaintiff was working at the time of his injury in cut No. 3. Cut No. 3 consisted of three parallel tracks, extending in an east-and-west direction. The rock pit was located at the east end of the cut. The tracks were designated by numbers. The south track, or track No. 1, was known as the shovel track, upon which was operated a steam shovel. The middle track, or track No. 2, was known as the loading track. The north track, or track No. 3, was known as the set-out track. The broken and loosened rock was scooped out of the rock pit and loaded upon dump-cars by means of the steam shovel upon track No. 1, or the shovel track. When the dump-cars were to be loaded, several of the cars were pushed onto track No. 2, or the loading track, by means of a small steam locomotive, known as a "dinky-engine," and each dump-car in turn would be "spotted" or placed on the loading track alongside the steam shovel for the purpose of loading the car. After the several dump-cars were loaded they were pulled out of track No. 2 by the dinky-engine and switched onto track No. 3, or the set-out track, from whence the loaded cars were made up into a train, and later taken to the crusher, where the pieces of limestone rock are ground into cement. The injury to plaintiff occurred between tracks No. 1 and 2, that is, between the shovel track and the loading track. The distance between the inside rails of those two tracks was given by plaintiff and his witnesses as eight to twelve feet, whereas defendants' witnesses estimated the distance between the inside rails of the two tracks as being eighteen to twenty feet.

Plaintiff was injured about 4:30 o'clock on the afternoon of October 14, 1924. As foreman of the switching crew, plaintiff directed

318

the "spotting" of the dump-cars for loading upon track No. 2, and the removal of such cars after they had been loaded by the steam shovel. The steam shovel was located at the east end of track No. 1, at the east end of which track was the pit of blasted rock. The steam shovel is operated by an engineer, or shovel-man, who, by means of certain mechanical appliances at his command, controls and operates a boom several feet in length, to the end of which boom is suspended a large steel dipper or scoop. The dipper is lowered by means of the boom and pushed into the blasted rock until the dipper is filled, when it is lifted and swung by the boom over the top of the dump-car, where the content of the dipper is allowed to fall from the bottom of the dipper into the dump-car immediately beneath and below the dipper. . The steam shovel equipment was from 130 to 140 feet in length, excluding the length of the boom and dipper. The dump-cars were each approximately fifteen to eighteen feet long, and the customary and usual loading capacity of each dump-car was about twenty tons. Where the distance between the inside rails of the shovel track and the loading track is less than twenty feet, it was customary to "spot" the rear end of the dump-car at a point opposite the front trucks of the steam shovel, in order that the dipper on the end of the boom of the steam shovel, when swung, would not extend over and beyond the top of the dump-car and drop its load of broken rock upon the ground instead of upon the bed of the dump-car. Because the distance between the shovel track and the loading track was less than twenty feet in the present case, plaintiff had "spotted" the dump-car which was to carry the load from which the rock fell, causing plaintiff's injury, in the position just described. The dump-car in question was immediately next to, and in front of, the locomotive, or dinky-engine, which controlled the movement of the dump-cars, of which there was a string of three cars.

Respecting the manner and cause of his injury, plaintiff testified as follows:

"The space in between the loading track and the shovel track was approximately between eight and eleven feet; ordinarily the distance is twenty-two or twenty-three feet. We were working in very close quarters there, rock and men. After I set four loaded cars on No. 3 track (the set-out track), I came back into the loading track with three empties, and the steam shovel engineer told me that he would load the car next to the (dinky) engine. . . . I spotted the car next to the engine for him just behind the jackarm (of the steam shovel) : we had to spot it that way because we were in close quarters, and the swing of the boom or dipper would not be in line if you didn't spot it (the car) ahead. . . . He (the steam shovel engineer) filled the car heaping—after the car had what I thought,

had more than a load on it, a big rock rolled off the pile where he had been digging on the side of the bluff, weighing between four and five hundred pounds—dropped down in his way—and he could not move the shovel until he got it out of the way. He scooped it up with the dipper and, after he had it in mid-air, he hesitated as to just what he would do with it. Ordinarily they placed them on the right-hand side of the shovel, or next to the bluff, out of the way, and what we call the 'powder monkeys,' or men that handle the dynamite, come along and burst these rocks so the dipper could handle them. About that time Mr. Ruch (defendant's foreman) came up on the other side, where he could look right through— I was close enough and could not help but hear the order. He (Ruch) said to load it on the car and have me haul it out. . . . Then he (the shovel engineer) loaded up the rock. I was to the rear of the shovel as far as I could get in the safety zone, was trying to be safe—my mind was occupied with the spotting of the next two empties. . . . He gave me a signal to back—the engineer of the steam shovel did. . . . I gave the engineer (of the dinky-engine) the signal to back up, with my back to the engineer. I wondered why he didn't move, and I saw then he (the locomotive engineer) was out of my line of vision; either that or I was out of his. I walked forward to where I had a good advantage to give the signal, placed my hand on the jackarm of the steam shovel to steady myself, and began to move him back slowly, with my back towards him. The car only moved up in my judgment about four to six feet when something caused me to look around. The men on the car said they hollered at me, and they might have, but my mind was occupied with my work and I didn't hear them. Anyway, the danger present probably caused me to look around and I saw the rock just before it hit the ground. It sloped off on me—the first place it hit was the crown of my hat; the next place was my shoulder, and then it caught me down over the right side. . . . Twenty tons is the capacity load of the cars such as I had on this occasion.''

Cross-examination: ''I saw him when he loaded the rock onto the last car, but paid no particular attention to it because my mind was directed to my other duties. I had nothing to do with the loading of it; all I had to do was to wait for the signals from the steam-shovel engineer. The whistle from the steam-shovel engineer indicated to me that the car was full; then my duties were to have the locomotive engineer take the car out of there and spot the other two cars, and I attempted to move the car out, but I didn't get it out. I didn't observe particularly the loading of this rock at the time. . . . The steam shovel was on my right and my train was on my left, looking forward. I was facing forward, with my back towards the (locomotive) engineer. What I called forward is the way the

steam shovel faced (east), and looking forward my engineer would be behind me, towards the rear of the steam shovel. . . . That would put my engineer somewhere along about eighteen feet from me. I don't remember having to move the car while it was being loaded. The engineer was within eighteen feet of me when I signalled him to move back, that the car had been loaded.''

Champ Williams, an employee of defendant at the time of plaintiff's injury, corroborated plaintiff's testimony. Williams testified: ''There was an accident some time like 4:15 or 4:30 P. M. to the best of my knowledge. I saw Mr. Ruch there that day, saw the loaded cars. I was about fifteen or twenty feet from the loaded cars. My work required me to be there while cars were loaded. I saw the accident. I saw this car being loaded with rock piled up to something like two to two and one-half feet above the car. About the time the last dipper full of small rock was put on the car there was a large boulder came rolling down from the side of the bluff in front of the steam shovel The boulder was picked up by the steam-shovel man. After he got it picked up he hesitated and looked around. After he hesitated with the rock, he put it up on top of the car. Mr. Ruch (defendant's foreman) told Mr. Sampson, the engineer of the steam shovel, to set the rock on top of the car and to have the car set out. I was approximately twenty or twenty-five feet from the rock when I saw it set upon the car. There was something like, I should judge, twenty-seven or twenty-eight tons of rock approximately on the car at the time the rock was placed. When the boulder was put on the car, the rock and dirt arose higher than the sides of the car, approximately about two and one-half feet, not square across like a stack of bricks, but round-shaped, rounded off. It was two and one-half feet above the edges in the center, not at the edges of the car. I saw the boulder after it was placed on the car. It was put on top of this mound, or on top of the round-shaped load, where it was leaning a little bit to the left side of the car. The mound on the car sloped all the way down on each side of the car. There were no level places where the rock was placed. . . . I was standing about fifteen feet from the jackarm of the steam shovel, and to the rear, alongside of the steam shovel. I was pretty close to it. I was waiting for orders that the car was loaded. . . . I saw Mr. Ruch while this last car was being loaded. He was on the other side of the load—while this last car was being loaded; I saw him while the first cars were being loaded, also. He (Ruch) had been there most of the time since I had come to work at three o'clock. . . . I had no trouble in seeing this rock from where I was standing; I could see it plainly on the car. It was a clear day, about 4:30 in the afternoon, and everything there was visible and easy to be seen; obvious to the person observing it. I was careful to keep

back so that anything that might fall from the car would not injure me. I exercised that care with reference to my own safety. It is not an unusual thing for rock to fall from one of these dump cars. We find them falling over the track all the way from the quarry to the crusher. The track is in a temporary condition. The dump cars are constructed with chains; permits it to form this movement of the cars as they are moved. Sometimes they sway when going over low places, from one side to the other. Every man who works about the quarry is familiar with this fact. . . . When Mr. Ruch told Mr. Sampson to place the boulder on the end of the car, Morris (plaintiff) was back near the fireman's door on the steam shovel, standing there waiting for orders. The customary position for Mr. Morris (plaintiff), while directing the movements of his train, varies according to his vision of the engineer, so he can give signals. . . . The clearance between the two tracks (after taking into consideration the overhang of the steam shovel and of the dump-car) I judge was about six feet. That is free space where a man can walk; it was in that space that Mr. Morris was when he was hurt. I was in the same space, a little behind him, to the west of him, toward the back of the work train. . . . The position of Mr. Morris to conduct his work of signalling was to be in this six-foot clearance space between the two tracks, to take signals from the engineer of the shovel and transmit them to the engineer of the switch train. . . . To transmit his signals, he (Morris) stepped up near the car so he could see around—that would put him up—he got nearer to the car that was being loaded; that would enable him to clear the back end of the shovel that was obstructing his view, that is my idea about it. I should judge he was something like three feet from the edge of the car, where it projected out over the track. He was in the six-foot space; if he was right in the middle of it he would be within three feet of the car. Before he moved up he was nearer the shovel—almost up against it—and he moved up to about the middle of the space; then he could pass his signal. At the time he was hurt, Mr. Morris was nearer to the west end of the car; that is, the end on which this big boulder was deposited. . . . I saw them actually load the boulder onto the shovel and bring it up to the side; it swung around and dropped it onto the car at the west end of it. It was set kind of slanting towards the left side of the car. I judge the car is about eight feet across (wide). There is something like an elevation of two feet in the center, sloping down in each direction, about four feet to make it eight feet wide. It (the boulder) was a little towards the north, on the side away from Mr. Morris; the boulder seemed to be leaning away from him, tilted a little to the north and away from the side he was on, was not quite square on top of the car, a little bit the other way. The

boulder was kind of an oblong rock, one slab of limestone. I think to the best of my knowledge it was about four feet long, was about eighteen or twenty inches wide, and about the same thickness. That was carried up as one load for the shovel; that is the very last thing the shovel did. The engineer got up all the loose rock he could reach, and this rock had rolled in the way, and he (the shovel-man) wanted to get it out of the way. . . . That is why they lifted it up. When the rock slid off, I saw it slide. I was still standing where I have described. The switch train was moving just a little bit. It had started to move back to the west and bring another car in place. When the train started to move, the rock I should judge to be northeast of Mr. Morris. It was to the east of him and the track was to the north of him, something like five or six feet. The train moved five or six feet before the rock fell. . . . I saw it coming and attempted to warn Morris—hollered—told him to look out; he didn't appear to hear me, moved just the least little bit; he just raised his head up a little. I made a dive to get hold of him, but I didn't get ahold of him in time. He was in the line of the rock that came his way. He was just leaning over watching some rock under the edge of the car that was dragging the journal box on the car, and it looked like that might cause this car to jump the track. It was loose rock on the track; I saw it there. That is what he (Morris) had his attention on, with his head down. When I called to him he raised his head up in time for it not to strike him on the head, strike his head.''

According to appellants' abstract of the record, the witness Williams thus testified as to what caused the rock or boulder to fall from the dump-car: ''I saw what made the rock fall off. *Part of the rail up there gave way on the right-hand side of the track,* foundation of the rock came out and it overbalanced it and *it came right over on the edge. Part of the rail gave way,* the load, it slipped down towards Mr. Morris's side, then it dropped on down and over the edge.''

The respondent has questioned the abstracting of the foregoing testimony of the witness Williams as a misstatement of the witness's testimony, and has filed an additional abstract of the record, wherein the testimony of the witness is copied from the bill of exceptions, as follows: ''Q. This car moved about five feet; did you see what it was that made the rock fall off? A. Yes, sir. Q. Well, what was it? A. Well, *part of the mound up there caved away on the right-hand side of the track.* The foundation under the rock came out and it overbalanced it and *it came right off, end over end.* Q. *Part of the crown or the crest gave away; is that it?* A. Yes, sir. Q. That let it slip down towards Mr. Morris's side? A. Yes, sir. Q. Then it slipped on down and off the edge? A. Yes, sir.''

The evidence on behalf of defendants tended to show that it was the duty of plaintiff, as switching foreman, to take charge of the dump-car, when loaded, and to thereafter control its movement; and, furthermore, if the switching foreman saw that rock was carelessly loaded upon the dump-car, and was dangerous or likely to fall from the car, or that the dump-car was overloaded with rock, it was then the duty of the switching foreman to request the steam-shovel engineer to remove the danger before causing the car to be moved from the loading track. The steam-shovel engineer testified that no such request was made by plaintiff prior to his injury. Both the steam-shovel engineer, Sampson, and the defendant's foreman, Ruch, testified that no order or direction was given by Ruch respecting the loading of the dump-car or the placing of the rock thereon. The foreman, Ruch, denied that he was present at the time of the loading of the dump-car, and of plaintiff's injury. The testimony of Ruch was corroborated to some extent by the testimony of Sampson, the steam-shovel engineer, and of Samuel Basnett, the engineer of the dinky-engine, both of whom testified that they did not remember having seen Ruch at the time the dump-car was loaded and moved. By way of impeachment of Basnett's testimony, however, plaintiff was permitted to offer in evidence the written statement of Basnett, made and signed by him shortly after plaintiff's injury, which statement reads as follows: "A large rock weighing about four or five hundred pounds rolled off, striking Mr. Morris and injuring him. The car was improperly loaded as containing about twenty-five or twenty-seven tons, and was piled up high. Mr. Ruch was quarry foreman on this shift and was present while these cars were being overloaded. I didn't hear him object at any time to the loading of these cars."

The foreman, Ruch, admitted by his testimony that the loading capacity of the dump-car was twenty tons, and, if it had twenty-seven tons upon it, the car would be overloaded. Ruch testified that he saw the car after plaintiff's injury, and that "this carload was about the average load, the usual load; I do not know how many tons of rock was on it; according to the way they estimate it, it was about twenty tons." Ruch estimated the weight of the rock which fell from the car as 300 to 400 pounds.

As to plaintiff's position between the tracks at the time of his injury, the witness Basnett testified: "Mr. Morris was in the proper place on the engineer's side, giving signals. I think that it is a rule that it is more convenient in doing the work to stand on the engineer's side rather than on the fireman's side." The foreman, Ruch, testified respecting such matter: "There is no set rule or established custom where the switch foreman shall stand while performing his

duties. The foreman of the switching crew may stand anywhere in performing his duties where he can give signals to the engineer.''

As to the loading of the rock which injured the plaintiff, the shovel engineer, Sampson, testified: ''Regarding the loading of the rock, it was just a rock gathered with a big pile of other rock; that is all it was; it was not an oversized rock, just a rock picked up in making our loading of the car, and it was a rock that came into the bucket and swung on the car, and when it was dumped this rock dumped on top. That was the last bucketful up to the car. When I picked up the rock I didn't hold it suspended in air waiting for a decision as to where to put it or anything of that kind; nothing of that kind happened. . . . I just remember that we picked this rock up with the rest of the rock that was in the bucket; didn't make any special move to get it; just put it in the bucket. I didn't hesitate about dropping it; left it in the load with the rest of it. This was an average load of rock ordinarily loaded there in the quarry. . . . The rock was in the last bucketful put on the car. As to what caused the rock to fall, as the car started back they passed over a low place in the track where the rails were uneven, tilted the car, and that threw the rock and caused it to become dislocated. The car must have moved something like five or six feet before it fell. . . . It is the duty of Mr. Ruch, if he is there, to tell me about a car if it is overloaded or underloaded. If he was there I don't know it. I don't know whether he was there when the rock fell. Mr. Ruch has full charge of me at all times. He had full charge of Mr. Morris. He is superintendent of the work from two to eleven o'clock.''

Plaintiff's injuries consisted of an oblique, transverse fracture of the fibula, or small bone, of the right leg at a point midway between the knee joint and the ankle joint. He also suffered a puncture, or flesh wound, on the posterior surface of the muscles of the calf of the right leg. Plaintiff was treated in the hospital at Hannibal by the physicians of defendant corporation, and was discharged from the hospital two weeks after the date of his injury. Dr. Bourn, one of the attending physicians, testified that the treatment of the fracture of the fibula had resulted in a good union of the bone and that, in his opinion, the fibula was as strong as it ever was. Dr. Chilton, another attending physician, testified that plaintiff had ''made a good recovery; had a good union, free use of the limb; and that the leg itself was in good condition at the present time, and that no permanent injury resulted to plaintiff.'' Plaintiff's medical testimony was to the effect that the union of the bone was complete, but that callous had been thrown out around the fracture, which callous formation, however, according to the testimony of plaintiff's medical witnesses, ''is nature's process of strengthening the bone,

and an enlargement is usually expected and desired at the point of union.''. Plaintiff's medical testimony was to the effect that the muscle fibers in the calf of plaintiff's right leg had grown together, because of scar tissue, resulting in the loss of the power of contraction and relaxation, and that the muscles in the calf of plaintiff's right leg are rigid and firm, instead of being flexible and pliable, as normally, resulting in a limited flexion of the limb below the knee joint, so that the lower limb has only about one-half of normal flexion. It was the opinion of plaintiff's medical witnesses that such condition of the muscles was due to infection, attributable either to the treatment of plaintiff's injury, or to the tearing and mashing of the muscles at the time of injury. Defendants' medical witnesses testified that they found no infection in plaintiff's limb while he was under treatment in the hospital, and they attributed the loss or impairment of flexibility of the muscles in the calf of plaintiff's leg to lack of exercise, or failure on plaintiff's part to use the limb. There is testimony that plaintiff walked with a limping gait at the time of the trial, which was March 9, 1926, and that he complained of pain upon manipulation of the right limb.

Plaintiff was thirty-nine years of age at the time of his injury, and his life expectancy was shown to be 28.9 years, according to the American Experience Table of Mortality. He had been previously engaged in railroad service, as brakeman, switchman, and conductor, for several years, and had been in the employment of defendant corporation for approximately two years prior to his injury. Plaintiff testified that his average yearly earnings were $2100 at the time of his injury, and that, by reason of his injury, he was unable to do work of any kind until April 18, 1925, about six months after the date of his injury, when he was employed as an attendant in an oil and gasoline filling station in Hannibal, at which occupation he earned about $15 a week, or $780 a year. Plaintiff also testified that, in order to obtain employment with a railroad company, it is necessary for an applicant for employment to pass a physical examination.

I. At the close of plaintiff's evidence, and again at the close of all the evidence, the defendants requested the trial court to give to the jury a peremptory instruction directing a verdict for defendants. The refusal of the trial court to direct a verdict for defendants is assigned as error by the appellants. It is strenuously urged by appellants that they were entitled to a directed verdict, it being claimed that the evidence is wholly insufficient to establish the single ground or specification of defendants' negligence alleged in plaintiff's petition.

As we view the petition, the plaintiff seeks a recovery upon a single ground of negligence, namely, that after the dump-car had been loaded to its reasonable capacity, the defendant Ruch, foreman and vice-principal of the defendant corporation, in the performance of his duties as such vice-principal, negligently ordered and directed the steam-shovel engineer, Sampson, to place additional rock, including a certain large boulder, upon the dump-car, when the defendants knew, or by the exercise of ordinary care should have known, that the boulder, when placed upon the dump-car by the steam-shovel engineer in obedience to the order and direction of the foreman and vice-principal, was likely to fall from said dump-car and to strike persons, including plaintiff, who might be in proximity to the dump-car in the performance of their ordinary duties. In other words, the gravamen of plaintiff's cause of action is the alleged negligent order and direction of the foreman and vice-principal of the defendant corporation, given to the steam-shovel engineer, to place upon the dump-car, which theretofore had been loaded to its reasonable capacity, an additional large boulder or rock, which, because of the capacity load of rock already upon the dump-car, would likely fall from the dump-car and strike persons working thereabout. Appellants, by their assignment of error, challenge the sufficiency of the evidence to establish the single specification of negligence thus charged against defendants as the gravamen of plaintiff's cause of action.

A demurrer to the evidence admits as true every fact and circumstance which the evidence adduced by plaintiff tends to prove, and the plaintiff is entitled to the benefit of every inference of fact which may reasonably be drawn therefrom. [Stauffer v. Railway Co., 243 Mo. 305, 316.] Furthermore, in passing upon a demurrer to the evidence, the evidence must be considered in the light most favorable to the plaintiff, and the evidence adduced by the defendants and demurrants must be disregarded as untrue, except in so far as defendants' evidence tends to aid the plaintiff's case. [Stauffer v. Railway Co., supra; Goucan v. Cement Co., 317 Mo. 919, 929.] Where there is any substantial evidence, tending to establish the negligence charged by plaintiff against defendants, the issue of such negligence must be submitted to the jury for determination as one of fact; and it matters not what view the appellate court may have respecting the weight of the evidence, or respecting the credibility of the witnesses and of their testimony, for, in an action at law for the recovery of damages arising out of an alleged tort, the appellate court cannot weigh the evidence, and it is the province of the jury, as the constituted triers of the facts, to weigh the evidence, and to pass upon the credibility of the witnesses and of their testimony. [Gannon v. Gas Light Co., 145 Mo. 502, 515; Trust

Co. v. Hill, 283 Mo. 278, 282, and cases there cited; Keller v. Butchers' Supply Co. (Mo. Sup.), 229 S. W. 173, 175.]

The evidence on behalf of plaintiff is to the effect that the defendant, Ruch, ordered and directed the steam-shovel engineer, Sampson, to place the boulder upon the dump-car, and that, at the time such order and direction was given by Ruch, the dump-car had already been loaded beyond its reasonable capacity. It is admitted by defendants' evidence that Ruch was the foreman or superintendent of the defendant corporation in charge of the quarry operations at the time the dump-car was loaded by the steam-shovel engineer. The defendant, Ruch, testified that he was "the foreman of the Atlas Portland Cement Company for the quarry department," and Sampson, the steam-shovel engineer, testified that Ruch was the superintendent of the work and had "full charge" over both the steam-shovel engineer and plaintiff, and that "it is the duty of Mr. Ruch, if he is there, to tell me (Sampson) about a car if it is overloaded or underloaded." While both Sampson and Ruch, on the one hand, denied that Ruch gave to Sampson any order or direction to load the boulder upon the dump-car, and denied that Ruch was present at any time during the loading of the dump-car, yet both the plaintiff and his witness; Champ Williams, on the other hand, testified quite positively that Ruch was present at the time of the loading of the dump-car, and that Ruch ordered and directed Sampson to place the heavy boulder thereon. The evidence adduced by plaintiff was to the effect that the loading capacity of the dump-car was about twenty tons, and that the dump-car had been loaded with twenty-seven or twenty-eight tons of rock at the time Ruch ordered and directed the boulder to be placed on the car by the steam-shovel engineer. The defendant, Ruch testified that "the capacity of the car is twenty tons, and if it had twenty-seven tons on it, it (the dump-car) would be overloaded." The evidence is somewhat meager in the description of the type, construction and dimensions of the dump-car. However, photographs of such cars were put in evidence by the defendants, from which it appears that the dump-car consisted of a bed, having four sides, but with no top. From the photographs in evidence, it appears that the bed of the dump-car is elevated somewhat above the trucks and wheels of the car, and that the sides of the bed of the car are rather low in height as compared to the width and length of the bed. The printed record before us recites that the photographs were admitted in evidence "for the purpose of showing the cars, so the jury can get an idea what they (the cars) look like, and (for the purpose of showing) the average load upon one of the cars." The photographs having been offered in evidence by defendants for the purposes aforesaid, the jury had the right to draw the reasonable inference therefrom that each of the dump-

cars shown in the photographs was loaded with an "average" load, that is to say, a load of rock not exceeding twenty tons, which was the capacity load. The photographs in evidence show the rock loaded upon each of such dump-cars as extending somewhat higher than the sides of the beds of the cars, and as being mounded in the center of the bed and as sloping slightly to each side of the bed of the car. One of plaintiff's witnesses was shown the photographs in evidence, and was asked to compare the load of rock upon the dump-car at the time of plaintiff's injury with the "average" load of rock shown upon the dump-cars in the photographs, to which inquiry the witness answered: "In comparison with defendants' exhibits 4 and 5, the car from which the boulder fell was *piled up higher* than these cars" (shown in the photographs). The signed statement of the defendants' witness Basnett, admitted in evidence by the trial court by way of impeachment of the witness's testimony at the trial, recites: "The car was improperly loaded as containing about twenty-five or twenty-seven tons, and was *piled up high.*" The witness Basnett testified on the trial that "the car was *piled up pretty good.*" The testimony of plaintiff's witness Champ Williams, was to the effect that there was approximately twenty-seven or twenty-eight tons of rock on the dump-car at the time the boulder was placed on the car by the steam-shovel engineer; and the witness testified further: "When the boulder was put on the car, the rock and dirt arose higher than the sides of the car, approximately about two and one-half feet, not square across like a stack of bricks, but round shaped, rounded off. It was two and one-half feet above the edges, in the center of the car. . . . The mound on the car sloped all the way down on each side of the car. There were no level places where the rock (boulder) was placed." If the car had been loaded with twenty-seven or twenty-eight tons of rock (as plaintiff's evidence tended to show) prior to the time when the defendant's foreman, Ruch, ordered and directed the steam-shovel engineer to place the boulder upon the car, then the car contained seven or eight tons of rock more than its capacity load of twenty tons (which capacity load was admitted to be twenty tons by defendant Ruch), and hence the car was overloaded to the extent of approximately one-third over and above the capacity of the car, before the boulder was placed upon the car. While it is true that there is no evidence herein that the dump-car, or the sides thereof, collapsed, or gave way, under the excessive weight of the load of twenty-seven or twenty-eight tons thereon, and the superadded weight of the boulder (which, according to the defendants' evidence, weighed 300 to 400 pounds), and while there is no evidence that, by reason of the excessive *weight* of the load on the car, the boulder was caused to fall therefrom, nevertheless the plaintiff was entitled to the inference, reasonably

to be drawn from the evidence, that the *bulk, or mass*, of rock upon the dump-car was considerably in excess of the bulk, or mass, of rock which would have been upon the car had the car not been loaded beyond its capacity. Plaintiff was entitled to the benefit of the further inference, reasonably to be drawn from the evidence, that the bulk or mass of rock upon the overloaded car was mounded and piled higher above the sides of the bed of the car than if the car had not been loaded beyond its capacity, and that such mass of rock upon the overloaded car, by reason of being mounded and piled higher than ordinarily above the sides of the car bed, would be more likely to become dislodged and fall over the sides of the bed of the car than if the car had not been overloaded. The evidence on plaintiff's behalf further tended to show that the distance between the inside rails of the shovel track and the loading track was eight to twelve feet, and that, after taking into account the overhang of the steam shovel and of the dump-car, there remained approximately only six feet of clear space between the two tracks, wherein plaintiff, as the foreman of the switching crew, had the right to be in performing his work. The evidence also is to the effect that the switching foreman customarily performed his work on the engineer's side of the train, where he was in better position to transmit signals to the locomotive engineer, and that such position, in the instant case, placed plaintiff between the inside rails of the shovel track and the loading track. The foreman and vice-principal, Ruch, in the exercise of ordinary care was bound to know (at the time he gave the order and direction to the steam-shovel engineer to place the boulder upon the dump-car) the existing and surrounding circumstances and conditions, namely, that the dump-car was already loaded beyond its capacity, both as to the *weight* and as to the *bulk* of the load of rock thereon, and that the mass of rock then upon the dump-car was mounded or piled higher than ordinarily above the sides of the car, so that the boulder was likely to be dislodged and fall from the car; he was bound to anticipate that plaintiff, in the performance of his duties as switching foreman, would take a position in the narrow space between the shovel and loading tracks, in order to transmit signals to the locomotive engineer for the movement of the dump-car.

Viewing the evidence in the light most favorable to plaintiff, and allowing to plaintiff the benefit of every inference of fact reasonably to be drawn therefrom, we think that the evidence is substantial, and amply sufficient to establish the facts that the defendant, Ruch, was the vice-principal of the defendant corporation, and that, as such vice-principal, he gave to Sampson, the steam-shovel engineer, an order and direction to place the heavy boulder upon the dump-car, which dump-car, at the time such order and direction was given

by the vice-principal, was already loaded beyond its capacity, both as to the weight and as to the bulk of the load of rock thereon. Whether such order and direction was given by the vice-principal, and whether the giving of such order and direction, under all the facts and circumstances in evidence, constituted negligence upon the part of the defendants, were issues of fact properly submissible to the jury for their determination, by an appropriate instruction submitting such issues. [Compton v. Construction Co., 315 Mo. 1068; Goucan v. Cement Co., 317 Mo. 919.]

It is claimed by appellants, however, that plaintiff's evidence shows that the proximate cause of his injury was not the alleged **negligent order** given by the foreman and vice-principal, but was the defective track, which gave way beneath the wheels of the dump-car and thereby caused the foundation of the rock to come out, causing the boulder to fall from the car upon plaintiff. Hence, it is urged that plaintiff's evidence fails to prove that the alleged negligent order of the vice-principal was the proximate cause of plaintiff's injury; or, in other words, appellants contend that the cause of injury pleaded was not the cause of injury proved. This contention of appellants, however, is obviously grounded upon a misconception of the testimony of the plaintiff's witness, Champ Williams. It is true that appellants have abstracted the testimony of the witness as follows: "Part of the *rail* up there gave way on the right-hand side of the track, foundation of the rock came out and it overbalanced it, and it came right over on the edge; part of the *rail* gave way, the load, it slipped down toward Mr. Morris's side, then it dropped on down and over the edge." The respondent, however, challenges the manner in which appellants have abstracted the witness's testimony, and has filed herein an additional abstract, in which the testimony of the witness purports to have been copied *in haec verba* from the bill of exceptions, as follows: "Part of the *mound up there* caved away on the right-hand side of the track. The foundation under the rock came out and it overbalanced it and it came right off, end over end. Q. Part of the *crown* or the *crest* gave away, is that it? A. Yes, sir. Q. That let it slip down towards Mr. Morris's side? A. Yes, sir. Q. Then it slipped down and off the edge? A. Yes, sir." The correctness of respondent's additional abstract, setting forth the witness's testimony as contained in the bill of exceptions, is not controverted by appellants, and must be viewed by us as stating the witness's exact language. While the language used by the witness in expressing his thought is somewhat awkward and ambiguous, yet we think that it is reasonably clear, from the language used by the witness, that he attributed the dislodgement of the boulder to be due to the giving away of the mound or crest of

rock loaded upon the bed of the dump-car, which in turn caused the foundation of rock immediately under the boulder to give way, thereby overbalancing the boulder so that it slipped or rolled, end over end, over the side of the dump-car. We think that the testimony of the witness tended to prove the specific negligence averred in the petition as being the proximate cause of plaintiff's injury, and that such testimony cannot be viewed as proving another and different cause of plaintiff's injury, not alleged in the petition, namely, the giving away of the track beneath the wheels of the dump-car.

Appellants claim that the order to place the boulder upon the dump-car, if given by the foreman and vice-principal, Ruch, was **not a negligent** order, for the reason that Ruch did not direct the steam-shovel engineer, Sampson, to load the boulder upon the dump-car in a dangerous or careless manner, and that Ruch had the right to assume that Sampson, in obeying Ruch's order to place the boulder upon the dump-car, would use reasonable and ordinary care in performing the service required of him. We think, however, that the evidence clearly shows that it was not the *manner* in which the steam-shovel engineer placed the boulder upon the dump-car that made plaintiff's place of work unsafe, but that the evidence rather tends to show that plaintiff's place of work was made unsafe by reason of the order and direction of the foreman and vice-principal to place the boulder on the car at all, in view of the fact that the dump-car had already been loaded with a mass of rock beyond the capacity of the dump-car, thereby increasing the likelihood of the boulder becoming dislodged and falling over the side of the dump-car.

It is the well-established rule that the master is actionably liable for his failure to use ordinary care to provide the servant with a reasonably safe place in which to work. The rule has reference and application, as well, to the giving of an order by the master, or by his vice-principal, which order, when obeyed, renders the place of work of the servant not reasonably safe; and the actionable liability of the master for the giving of such an order is to be measured by the master's knowledge, actual or constructive, of the conditions, and of the surrounding facts and circumstances, existing at the time such order is given. [Stuart v. Standard Oil Co., 211 Mo. App. 345; Wright v. Iron & Steel Co., 213 Mo. App. 599.] Whether the order and direction was given by the foreman and vice-principal of the defendant corporation to place the boulder upon an overloaded dump-car, and, if given, whether such order was characterized by a want of ordinary care (on the part of defendant corporation and its vice-principal) to provide for the reasonable safety of the plaintiff in his place of work, and was the immediate and proximate cause of his injury, were each and all questions of fact which were

**332**

properly submissible to the jury upon the evidence herein. [Foster v. Railway Co., 115 Mo. 165.]

It is contended by appellants that, under the facts and circumstances in evidence, plaintiff must be held to have been contributorily negligent as a matter of law, and that he assumed the risk of injury; wherefore, it is urged that the trial court should have peremptorily directed a verdict for defendants. This contention of appellants is predicated upon the testimony of defendants' witness, Sampson, the steam-shovel engineer, to the effect that it was the duty of plaintiff, as switching foreman, to call attention to an overloaded car, or to a dangerously loaded car, and to request the shovel engineer to remove therefrom any rock which "looks like it might roll off or is dangerous;" that plaintiff, in his deposition taken prior to the trial, had affirmatively answered the question propounded to him to the effect "that you saw the rock loaded and considered it loaded dangerously, but in your judgment you thought it would ride;" that plaintiff's witness, Williams, testified that "it was not an unusual thing for rock to fall from one of these dump-cars," and that he (Williams) was "careful to keep back so that anything that might fall from the car would not injure me; I (Williams) exercised that care with reference to my own safety;" and that plaintiff, in signalling to the locomotive engine crew to move the dump-car, could have taken a position on the opposite side of the train of dump-cars and there given the signal to the locomotive fireman, who, in turn, would have transmitted the signal to the locomotive engineer; or plaintiff could have given the signal to the locomotive engineer without taking a position alongside the dump-car upon which the heavy boulder had just been loaded; and that therefore plaintiff elected to take a dangerous position in the performance of his duties, when he might have taken an absolutely safe position. The testimony of defendants' own witnesses, however, tended to show that it was usual and customary for the switching foreman to take a position upon the engineer's side of the train, in order the better to transmit signals to the locomotive engineer, which position placed the plaintiff, at the time of his injury, in the space between the loading and shovel tracks, where his presence and position should have been anticipated by defendants, and where, under all the evidence, he seemingly had a right to be in the performance of his duties.

Assuming that the evidence herein is sufficient to show that the plaintiff servant had some knowledge of the danger of his place of work, created by the order and direction of the foreman and vice-principal of the defendant master, nevertheless it has been uniformly held by this court that mere knowledge on the part of the servant of the danger of the place of work, where such danger is created by

negligence of the master, will not defeat an action for personal injuries suffered by the servant as the result of such dangerous condition, unless the danger occasioned by the master's negligence was so glaring, open and obvious as to threaten immediate and almost certain injury to the servant. [Jewell v. Bolt & Nut Co., 231 Mo. 176, 201, and cases there cited; Edmondson v. Hotels Statler Co., 306 Mo. 216, 230; Compton v. Const. Co., 315 Mo. 1068, 1087; Thorpe v. Railway Co., 89 Mo. 650.] As is aptly said by BLAIR, J., speaking for Division Two of this court in the recent case of Eaton v. Wallace, 287 S. W. 614, 616: "Knowledge on the part of the servant of the dangerous character of the place of work furnished by the master, where the danger is created by the negligence of the master, will not bar a servant from recovery of damages for injuries caused thereby, unless the danger of working in such place is so imminent and threatening that a person of ordinary prudence and caution would not continue to work in such dangerous place." The question of contributory negligence is usually one of fact for the jury (45 C. J. 1299; Albrecht v. Belting Co., 299 Mo. 12, 23; Edmondson v. Hotels Statler Co., 306 Mo. 216, 231) ; and, even where there is evidence tending to show the servant's knowledge of the danger of his place of work, the question whether his acts and conduct in the light of such knowledge constitute contributory negligence is a question of fact for the jury, unless the evidence is such that all reasonable men would draw the inference or conclusion from his acts and conduct that he was guilty of such negligence as contributed directly to his injury. [45 C. J. 1309; Young v. Oil Co., 185 Mo. 634, 667.] Where reasonable minds may draw different conclusions from all the facts and circumstances in evidence respecting the contributory negligence of plaintiff, the question of plaintiff's contributory negligence is not conclusively established, as one of law, but is one of fact for the determination of the jury. [45 C. J. 1306; Butz v. Const. Co., 199 Mo. 279, 287; Ganey v. Kansas City, 259 Mo. 654, 662; Albrecht v. Belting Co., 299 Mo. 12, 23; Compton v. Const. Co., 315 Mo. 1068, 1089.] In the present case, we cannot conclusively say, as a matter of law, that the danger of the boulder falling from the overloaded dump-car was so glaring, open and obvious as to threaten immediate and almost certain injury to plaintiff while working in close proximity to the dump-car; or can we conclusively say that the danger of working in such place, in proximity to the dump-car, was so imminent and threatening that a person of ordinary prudence and caution would not have continued to work therein. The facts and circumstances in evidence herein are such that reasonable minds may draw different conclusions as to whether or not plaintiff was contributorily negligent in working in close proximity to the dump-car, and the trial

court did not err in submitting such question as one of fact to the jury for determination. The question whether plaintiff selected an unsafe place in which to work, when he might have selected another and safer place, was likewise properly submissible to the jury for determination, for the reason that it cannot be conclusively said, as a matter of law, under the evidence herein, that a reasonably prudent and careful person would not have taken a position (as did plaintiff) alongside the dump-car, but would have selected some other and safer place in which to work. [Richardson v. Railway Co., 223 Mo. 325, 339; Boehm v. General Electric Co., 179 Mo. App. 663, 671; Rhea v. Railway Co., 171 Mo. App. 160, 179, and cases cited.] Under the established rule in this State, there is no room for the application of the doctrine of assumption of risk in the instant case, the jury having found, upon the evidence adduced, that plaintiff's injury was occasioned by the negligence of the defendants. Under our prevailing State rule, the servant never assumes a risk which grows out of the negligence of the master, and where the master's negligence results in injury to the servant, and such negligence is found by the jury, the question of assumption of risk is eliminated. [Patrum v. Railroad Co., 259 Mo. 109, 121; Fish v. Railway Co., 263 Mo. 106, 124; Williams v. Pryor, 272 Mo. 613, 623; Loduca v. Railway Co., 315 Mo. 331, 337; Hoffman v. Lime Co., 317 Mo. 86, 103.]

For the reasons herein stated, we are of opinion that the trial court properly refused defendants' requested peremptory instructions for a directed verdict, and the assignment of error must be denied.

II. Appellants assign error in the giving to the jury of plaintiff's instruction numbered 1, which reads:

"You are instructed that if you find and believe from the evidence that on or about the 14th day of October, 1924, plaintiff was in the employ of the defendant company as a switchman in its rock quarries and plant at Hannibal, Missouri, and was on said date in the performance of his duties for said defendant, assisting in the movement of certain cars attached to a dinky engine, and that while so engaged, a rock or boulder fell from the top of a certain car upon and against plaintiff and caused him to sustain injuries; and if you further find and believe from the evidence that said car had been loaded with rock by the defendant company through its employees by means of a steam shovel to a reasonably full capacity prior to the time the rock or boulder mentioned in evidence was loaded upon said car; if you further find and believe from the evidence that the defendant J. H. Ruch was the foreman and vice-principal of the defendant company, in charge

of said work, and was plaintiff's superior, and if you find and believe from the evidence that the defendant J. H. Ruch as such foreman and vice-principal ordered the steam shovel engineer to place said rock or boulder upon said car after it had been loaded to its reasonable capacity, if you find it had been so loaded, and if you further find and believe from the evidence that said boulder when loaded, if you so find, was likely to become dislodged and to fall from said car when said car was moved in the usual manner, and if you believe and find from the evidence that the steam-shovel engineer acted in obedience to said order, if you find such order was given, and loaded said rock or boulder on said car as ordered, if you so find, and if you further find and believe from the evidence that said rock or boulder when so loaded, if you so find, was not reasonably safe to the employees of the defendant company, while working thereabout, particularly plaintiff; and if you further find and believe from the evidence that the defendant knew, or by the exercise of ordinary care could have known, at the time said order was made, if you find it was made as aforesaid, that said rock or boulder when loaded would be likely to become dislodged and fall from said car, when it was moved in the usual manner, and that said rock or boulder when so loaded would not be reasonably safe to plaintiff and the other employees of the defendant company working thereabout, and if you further find and believe from the evidence that the giving of said order by the defendant J. H. Ruch as the vice-principal and foreman of the defendant company, if you find he did give such order and that he was at the time acting as the vice-principal and foreman of the defendant company, constituted negligence; and if you further find and believe from the evidence that as the direct result of said negligent order, if you find said order was given as aforesaid, and that it was negligence, said boulder was caused to become dislodged and fall from said car and injured plaintiff, if you so find; and if you further find from the evidence that plaintiff was at the time in the exercise of ordinary care for his own safety; then your verdict must be in favor of plaintiff and against the defendants J. H. Ruch and the Atlas Portland Cement Company.''

It is claimed that there is no evidence upon which to predicate the instruction, in that plaintiff's proof in support of the specific negligence alleged in his petition wholly failed. Our adverse ruling upon the claim of appellants to a directed verdict, discussed in the preceding paragraph of this opinion, likewise disposes of this criticism of the instruction adversely to the appellants.

It is urged that the instruction is erroneous for the reason that it does not define the term ''negligence'' as used therein, and that

the instruction permitted the jury, without any guide from the court, to determine for themselves the law of negligence as applied to the facts and circumstances hypothesized in the instruction. In other words, the appellants claim that the instruction is erroneous in that it fails to tell the jury what acts or conduct on the part of defendants in the premises would constitute negligence, thereby submitting to the jury for their determination a question of law. The term "negligence" has a well-understood meaning, and it has been uniformly held that an instruction which allows the jury to find and determine whether the acts hypothesized therein constitute negligence, without defining the term "negligence," is not erroneous, especially in the absence (as in the present case) of any request, by the defendants, for the giving of an instruction defining such term. [Sweeney v. Cable Railway Co., 150 Mo. 385, 401; State ex rel. v. Cox (Mo. Sup.), 274 S. W. 373, 375; Russell v. Grocery Co. (Mo. App.), 288 S. W. 985, 987; Smith v. Greer (Mo. App.), 257 S. W. 829, 831; Malone v. Railway Co., 202 Mo. App. 489, 498; Godfrey v. Light & Power Co., 213 Mo. App. 139, 152; Adelman v. Altman, 209 Mo. App. 583, 597.]

It is claimed by appellants that the instruction is broader in its scope than the charge of negligence presented by plaintiff's petition, in that the petition charges that the foreman and vice-principal of the defendant corporation negligently and carelessly ordered the steam-shovel engineer to place upon the loaded dump-car a large boulder, in excess of the reasonable capacity of said car, "when the defendants knew, or by the exercise of ordinary care would have known, that said boulder so placed was *loose and unsupported and likely to roll about and fall from said car* and strike persons, including plaintiff, in the course of their ordinary duties," whereas the instruction permitted the jury to find in favor of plaintiff if the jury believed from the evidence that the defendants "knew, or by the exercise of ordinary care could have known, at the time said order was made, . . . that said rock or boulder when loaded *would be likely to become dislodged and fall from said car, when it was moved in the usual manner,* and that said rock or boulder, when so loaded, would not be reasonably safe to plaintiff and the other employees of defendant company working thereabout." It is obvious that the gravamen of plaintiff's cause of action, and the substantive ground or specification of negligence charged in the petition, is the *negligent order* given by Ruch, the foreman and vice-principal of the defendant corporation, directing the steam-shovel engineer to place the boulder upon the already overloaded dump-car, when the foreman and vice-principal knew, or by the exercise of ordinary care should have known,

that the boulder, when so loaded and placed upon the car, in obedience to the foreman's order, would be likely to fall from the car because of the overloaded condition of the car. Such is the reasonable intendment which must be accorded and given to the charge of negligence averred in the petition. The fact that the dump-car, when loaded, was not to be left standing and stationary upon the loading track, but was to be moved in the usual and customary manner, is likewise well and properly within the intendment of the petition. While it is true that, in submitting such issue to the jury, the instruction does not follow the precise, or exact, language of the charge of negligence as averred in the petition, yet the instruction unquestionably submits to the jury for determination the identical issue of defendants' negligence presented by the petition. A scrutinous comparison of the petition and the instruction discloses no substantial variance between the charge of negligence, as laid in the petition, and the submission of the same, by instruction to the jury. [Godfrey v. Light & Power Co., 213 Mo. App. 139, 151.] While it may be better practice, in the drawing of instructions, to follow as nearly as possible the language of the charge of negligence as laid in the petition, nevertheless we are aware of no requirement of law that instructions must follow the exact language of the pleadings; and where it is clear from the petition, the evidence and the instruction that the issue of negligence submitted to the jury is not in fact broadened, and where the instruction falls within the purview of both the petition and the evidence, no reversible error is shown merely because the instruction does not follow the exact language of the charge of negligence as stated in the petition. [Quinley v. Traction Co., 180 Mo. App. 287, 300; Barnes v. Elliott (Mo. App.), 251 S. W. 488, 490.] We are convinced that plaintiff's instruction is no broader in its scope than the substantive allegations of the petition (allowing to such allegations a fair and reasonable intendment), and fairly comes within the purview of both the pleadings and the evidence. The cases cited and relied upon by appellants in support of their criticism of the instruction deal with instructions that submit, as a basis of recovery, wholly distinct and different grounds of negligence than those laid in the petition. Those cases have no application in the present case, where obviously there is no substantial variance between the charge of negligence laid in the petition and the submission of such negligence by plaintiff's instruction. We find no error in the giving of plaintiff's instruction.

III. Lastly, appellants complain of the amount of the judgment ($13,500) as being greatly excessive in the light of the testimony respecting the nature and extent of plaintiff's injury, and respecting his pecuniary damage. The medical witnesses on behalf of

both the respondent and the appellants seemingly agree that there has been a satisfactory union of the parts of the fractured fibula, and that plaintiff sustained no injury to the bony structure of the knee and ankle joints of the right limb. They disagree as to the extent and permanency of the injury to the muscles in the calf of plaintiff's right leg. Plaintiff's medical witnesses testified that the muscle fibers in the calf of the right leg had grown together, and are rigid and firm and lacking in pliability and flexibility, resulting in muscular limitation of movement of the knee joint and a one-half reduction in the normal flexion of the limb. There is some evidence that plaintiff walked with "a limping gait" at the time of the trial, about a year and a half after the injury to his leg, but we find no evidence in the record that plaintiff is required to use a cane, crutch or other artificial means to aid him in walking, or that there is any noticeable deformity of his leg. Plaintiff was discharged from the hospital two weeks after the date of his injury, and went to work as an attendant in an oil and gasoline filling station six months after his injury, but his average earnings in the latter vocation are approximately one- third of his earnings as switching foreman while employed by the defendant corporation. There is no clear or positive evidence, however, that plaintiff, by reason of his injury, is obliged to follow the vocation of filling station attendant, or that he cannot engage in another and more lucrative vocation, or that he is prevented by his injury from again engaging in some kind of railroad employment.

Counsel for the respective parties have cited a number of decisions of this court touching the matter of pecuniary allowances for personal injuries. While decided cases, of course, are advisory on the question of excessiveness of verdict, they are not controlling, and this for the reason that it is impossible to lay down any hard-and-fast rules respecting the amount of compensatory damages which are applicable to every case. The rasonableness of the amount of recovery in each and every case must be ruled upon the evidentiary facts of such case, and the reasonable and sound judgment of the appellate court applied thereto. In a number of comparatively recent decisions, this court, upon the evidentiary facts therein, has deemed $10,000 to be ample and reasonable allowance for the entire loss or amputation of a leg. It goes without saying that, although the use of plaintiff's right leg may be somewhat impaired, still he has not suffered an amputation of the leg, and his ability to get about and to earn a livelihood is far better than if he had lost entirely the use of the leg. Under all the facts and circumstances in evidence, we regard an allowance of $8,000 as ample and fair compensation for the bodily injuries and pecuniary damage suffered by plaintiff. Such allowance is measurably comparable to, and in ac-

cord with, allowances lately approved by this court in cases involving injuries almost identical with those sustained by the plaintiff herein. [Kleinlein v. Foskin, 13 S. W. (2d) 648; Brucker v. Gambaro, 9 S. W. (2d) 918; Corn v. Railway Co., 228 S. W. 78; Powell v. Railways Co., 226 S. W. 916; Spencer v. Railroad Co., 317 Mo. 492; Lackey v. Railway Co., 305 Mo. 260.]

If the plaintiff, within ten days after the filing of this opinion, will file and enter in this court a remittitur of $5,500, as of the date of March 10, 1926, the judgment of the circuit court will stand affirmed for the sum of $8,000, with interest on said sum from March 10, 1926, the date of the verdict; otherwise, the judgment will be reversed and the cause remanded for another trial. It is so ordered. *Lindsay* and *Ellison, CC.,* concur.

PER CURIAM:—The foregoing opinion by SEDDON, C., is adopted as the opinion of the court. All of the judges concur, except *Gantt, J.,* who concurs in the result.